# 25-1050-cr

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

CHARLES BRENNAN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

# BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

SARAH KUNSTLER
LAW OFFICE OF SARAH KUNSTLER
*Attorneys for Defendant-Appellant*
315 Flatbush Avenue, Suite 103
Brooklyn, New York 11217
(718) 783-3682

COUNSEL PRESS (800) 4-APPEAL • (391564)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... iv

JURISDICTIONAL STATEMENT ..... 1

ISSUES FOR REVIEW ..... 1

STATEMENT OF THE CASE AND FACTS ..... 2

1. Background ..... 2
2. Pre-Trial Motion Practice Concerning Dismissal of the Indictment ..... 4
3. The Trial ..... 5
   - A. Jordan Snyder's Role as a Cooperating Informant ..... 5
   - B. The Controlled Transactions ..... 6
     1. July 25, 2022 (Count 2) ..... 7
     2. July 29, 2022 ..... 7
     3. August 2, 2022 (Counts 3 and 4) ..... 8
     4. September 7, 2022 (Count 5) ..... 9
   - C. The September 13, 2022, Search ..... 9
   - D. Mr. Brennan's Post-Arrest Statement ..... 11
   - E. Evidence Extracted from Electronic Devices ..... 11
   - F. The Defense Case ..... 12
   - G. Rule 29 Motions, Partial Acquittal, and the Remaining Counts ..... 16
   - H. Defense Request for a Spoliation Instruction ..... 18
   - I. Relevant Portions of the Jury Instructions ..... 19
     - a. Conspiracy (Count One) ..... 19
     - b. Entrapment ..... 20
     - c. Possession with Intent to Distribute (Count Six) ..... 20

d. Possession of a Firearm with an Obliterated Serial Number (Count Seven)........................................20

J. The Government's Conspiracy Argument................................21

K. The Defense's Entrapment Theory ........................................22

L. The Verdict ..........................................................................24

M. Probation's Draft and Final Presentence Reports.....................24

N. The Parties' Sentencing Submissions......................................26

O. The Sentencing.......................................................................29

SUMMARY OF ARGUMENT ..........................................................30

ARGUMENT .....................................................................................33

I. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONSPIRACY CONVICTION (COUNT 1) ............................33

A. The Law ..........................................................................33

B. The Government Failed to Prove an Agreement Between Brennan and Taylor...................................................34

1. The Text Messages Did Not Establish a Conspiratorial Agreement.............................................34

2. Taylor's July 29 Sale Did Not Establish an Agreement..............................................................35

3. Brennan's July 25 Testimony Did Not Establish an Agreement...........................................................36

4. Collectively, the Evidence Remained Insufficient.........37

C. The Jury's Limited Verdict Further Illustrates the Narrowness of the Government's Proof ..................................38

II. THE DISTRICT COURT ERRED IN REFUSING TO GIVE A SPOLIATION INSTRUCTION REGARDING THE DELETION AND NON-PRESERVATION OF THE INFORMANT'S TEXT MESSAGES ...............................................39

A. The Law ..........................................................................39

B. The Record Established a Sufficient Evidentiary Foundation ....................40

C. The Error Was Prejudicial ....................42

III. THE DISTRICT COURT PROCEDURALLY ERRED IN RAISING THE BASE OFFENSE LEVEL FROM 24 TO 26....................43

A. The Law ....................43

B. The Court Increased the Base Offense Level Without Making Findings Sufficient to Support or Explain the Quantity Increase ....................45

C. Brennan's Drug-Quantity Challenge Was Fully Litigated Before Sentencing ....................47

D. The Error Was Not Harmless....................48

IV. BRENNAN'S CONVICTION UNDER 18 U.S.C. § 922(K) CANNOT BE SUSTAINED UNDER THE SECOND AMENDMENT FRAMEWORK SET FORTH IN *HELLER* AND *BRUEN* ....................49

A. The Governing Framework....................49

B. Section 922(k) Burdens Conduct Covered by the Second Amendment....................50

C. There Is No Historical Tradition of Criminalizing Mere Possession Based on an Altered Serial Number ....................51

D. This Case Presents a Narrow As-Applied Challenge ....................51

CONCLUSION....................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... *passim*

*Jackson v. Virginia*,
443 U.S. 307 (1979) .......... 33

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) .......... 40

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .......... *passim*

*Residential Funding Corp. v. DeGeorge Fin. Corp.*,
306 F.3d 99 (2d Cir. 2002) .......... 39, 40

*United States v. Ahders*,
622 F.3d 115 (2d Cir. 2010) .......... 44

*United States v. Brown*,
945 F.3d 72 (2d Cir. 2019) .......... 44

*United States v. Bryant*,
711 F.3d 364 (2d Cir. 2013) .......... 4

*United States v. Carter*,
489 F.3d 528 (2d Cir. 2007) .......... 44, 45

*United States v. Castillo*,
36 F.4th 431 (2d Cir. 2022) .......... 43

*United States v. Cavera*,
550 F.3d 180 (2d Cir. 2008) .......... 43-44

*United States v. Cooper*,
131 F.4th 127 (2d Cir. 2025) .......... 44

*United States v. Dove*,
916 F.2d 41 (2d Cir. 1990) .......... 39

*United States v. Evangelista*,
122 F.3d 112 (2d Cir. 1997) .......... 39

*United States v. Guadagna*,
183 F.3d 122 (2d Cir. 1999) ....................................................................33

*United States v. Hawkins*,
547 F.3d 66 (2d Cir. 2008) ......................................................................34

*United States v. Jeffers*,
329 F.3d 94 (2d Cir. 2003) ......................................................................45

*United States v. Lanni*,
970 F.2d 1092 (2d Cir. 1992) ..................................................................45

*United States v. Martoma*,
894 F.3d 64 (2d Cir. 2017) ......................................................................33

*United States v. Maturo*,
982 F.2d 57 (2d Cir. 1992) ......................................................................45

*United States v. McCarthy*,
271 F.3d 387 (2d Cir. 2001) ....................................................................39

*United States v. Nusraty*,
867 F.2d 759 (2d Cir. 1989) ..............................................................34, 37

*United States v. Parker*,
554 F.3d 230 (2d Cir. 2009) ..............................................................33, 37

*United States v. Pimentel*,
346 F.3d 285 (2d Cir. 2003) ....................................................................39

*United States v. Powell*,
469 U.S. 57 (1984).....................................................................................38

*United States v. Samaria*,
239 F.3d 228 (2d Cir. 2001) ....................................................................34

*United States v. Suarez*,
2010 WL 4226524 (D.N.J. Oct. 21, 2010) ...............................................40

*United States v. Ware*,
577 F.3d 442 (2d Cir. 2009) ....................................................................44

**Statutes and Other Authorities:**

U.S. Const. amend. II .........................................................................*passim*

18 U.S.C. § 922(k) ...............................................................................*passim*

18 U.S.C. § 924(c) ....................3, 4, 38
18 U.S.C. § 924(c)(1)(A) ....................3
18 U.S.C. § 3553(a) ....................44
21 U.S.C. § 841(b)(1)(B) ....................3
21 U.S.C. § 841(b)(1)(C) ....................2, 3
28 U.S.C. § 1291 ....................1
Fed. R. Crim. P. 29....................16, 18, 33
Fed. R. Crim. P. 32....................47
Fed. R. Crim. P. 32(f)(1) ....................25, 28, 47
Fed. R. Crim. P. 32(b)(2) ....................47
Fed. R. Crim. P. 52(a) ....................44
U.S.S.G. § 2D1.1....................*passim*
U.S.S.G. § 2D1.1(b)(1) ....................27, 29
U.S.S.G. § 2D1.1(b)(2) ....................27, 29
U.S.S.G. § 2D1.1(b)(12) ....................27, 30
U.S.S.G. § 2D1.1(b)(18) ....................27
U.S.S.G. § 3C1.1 ....................27, 30

## JURISDICTIONAL STATEMENT

Appellant Charles Brennan filed a timely notice of appeal from a judgment of conviction docketed on April 21, 2025, in the United States District Court for the Northern District of New York (Nardacci, J.). (A1708.)[1] Jurisdiction rests on 28 U.S.C. § 1291. Jurisdiction in the district court was asserted by the Appellee, the United States of America.

## ISSUES FOR REVIEW

1. Whether the evidence was insufficient to sustain Brennan's conviction for conspiracy to distribute methamphetamine (Count One)

2. Whether the district court erred in refusing to give a requested spoliation instruction after the cooperating informant admitted deleting text messages, law enforcement failed to preserve the communications independently, and the missing messages were central to the government's conspiracy theory and Brennan's entrapment defense.

3. Whether the district court committed procedural sentencing error by increasing Brennan's base offense level from 24 to 26 based on an unspecified additional drug quantity without making findings sufficient to permit meaningful appellate review.

4. Whether Brennan's conviction under 18 U.S.C. § 922(k), based solely on possession in his home of a handgun with an obliterated serial number, violates the Second Amendment under the framework set forth in *District of Columbia v. Heller* and *New York State Rifle & Pistol Ass'n v. Bruen*.

[1] Citations to "A" refer to the Appendix. Citations to "Draft PSR" refer to the Draft Presentence Report. Citations to "Final PSR" refer to the Final Presentence Report.

## STATEMENT OF THE CASE AND FACTS

### 1. Background

This case arose after Jordan Snyder approached local law enforcement on July 25, 2022, and offered to serve as a paid cooperating informant in an investigation involving Charles Brennan. (A564–566; A607–609.) Over the following weeks, Snyder conducted a series of controlled purchases of methamphetamine while communicating with Brennan and Brennan's girlfriend, Samantha Taylor. The investigation culminated in the execution of a search warrant at Brennan's residence on September 13, 2022.

During the search, law enforcement recovered seven firearms, including one with a defaced serial number, and approximately 11 grams of methamphetamine, and 26 tabs of LSD. (PSR ¶ 23.) Brennan was arrested that day and charged by criminal complaint with possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). (A29–34.)

On January 11, 2024, a grand jury returned a six-count indictment. (A35–38.) The indictment charged Mr. Brennan with three substantive methamphetamine distribution counts arising from transactions on July 25, 2022, August 2, 2022, and September 7, 2022, in violation of 21 U.S.C. § 841(b)(1)(C) (Counts One, Two, and Four); possession with intent to distribute methamphetamine on September 13, 2022, in violation of 21 U.S.C. § 841(b)(1)(C) (Count Five); use of a firearm in relation to a

drug trafficking crime on August 2, 2022, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count Six).

The indictment was superseded on May 9, 2024. (A221–225.) The superseding indictment added one count—Count Seven—charging Mr. Brennan with possession of eight firearms in furtherance of a drug trafficking crime on September 13, 2022, the date of the search of his residence, in violation of 18 U.S.C. § 924(c).

A second superseding indictment was filed on August 22, 2024. (A356–360.) That indictment added a conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 841(b)(1)(B), as Count One and renumbered the remaining counts. As renumbered, the substantive distribution counts became Counts Two, Three, and Five; use of a firearm in relation to a drug trafficking crime on August 2, 2022, in violation of 18 U.S.C. § 924(c)(1)(A), became Count Four; possession with intent to distribute methamphetamine on September 13, 2022, in violation of 21 U.S.C. § 841(b)(1)(C), became Count Six; possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k), became Count Seven; and possession of eight firearms in furtherance of a drug trafficking crime on September 13, 2022, in violation of 18 U.S.C. § 924(c), became Count Eight.

### 2. Pre-Trial Motion Practice Concerning Dismissal of the Indictment

On May 3, 2024, prior to the filing of the first superseding indictment, Mr. Brennan, through counsel, filed an omnibus motion seeking, among other things, dismissal of Counts Three and Six of the indictment as unconstitutional. (A204–220.)

Defense counsel argued that following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), 18 U.S.C. §§ 922(k) and 924(c) were unconstitutional, both facially and as applied to Mr. Brennan, because they criminalized conduct protected by the Second Amendment.

On May 23, 2024, after the filing of the first superseding indictment, Mr. Brennan submitted a supplemental memorandum of law and affidavit in support of the omnibus motion. (A226–232.) Counsel argued that newly added Count Seven, like Count Three, was unconstitutional, both facially and as applied. Counsel further argued that the government lacked evidence connecting the firearms to any drug trafficking crime.

In a response dated June 3, 2024, the government opposed the motion, arguing that §§ 922(k) and 924(c) remained constitutional after Bruen. (A233–325.)

Defense counsel filed a reply on June 10, 2024. (A326–331.) On July 10, 2024, the district court denied the motion in its entirety. (A332–355.) The court concluded that *Bruen* had not abrogated *United States v. Bryant*, 711 F.3d 364 (2d Cir. 2013) (per curiam), which upheld the constitutionality of § 924(c), and agreed with the government that § 922(k) likewise remained constitutional.

### 3. The Trial

Trial began on September 17, 2024. The government's case relied primarily on Investigator Paul Zurlo, the case agent, and Jordan Snyder, the cooperating informant who conducted the controlled purchases, supported by testimony from officers who executed the September 13, 2022 search, and forensic witnesses who analyzed the seized drugs and extracted data from electronic devices.

The government's trial proof focused on (1) controlled purchases conducted by Snyder, (2) evidence recovered during the September 13, 2022 search, and (3) text-message and social-media communications extracted from devices seized during that search. The defense contested whether the evidence established an agreement with another person to distribute methamphetamine, whether key communications were preserved, and whether the firearm-related counts were supported by a nexus to drug trafficking.

### A. Jordan Snyder's Role as a Cooperating Informant

Investigator Zurlo testified that Jordan Snyder approached local law enforcement on July 25, 2022, and thereafter worked as a cooperating informant during the investigation of Charles Brennan. (A564–566; A607–609.) Snyder testified that he was introduced to Brennan by Samantha Taylor, Brennan's girlfriend, whom Snyder had known since childhood, and that, at the time the investigation began, he had known Brennan for approximately one month. (A678–

679.) Snyder further testified that, when he first met Brennan, he was delivering for DoorDash and Brennan gave him the nickname "Jor Dash." (A726–727.)

Zurlo instructed Snyder to preserve his communications with Brennan and to provide screenshots to law enforcement. (A633–635; A638.) Snyder nevertheless acknowledged that he deleted messages with Brennan and Taylor because he "likes to keep a clean phone," and did not recall informing Zurlo that he had done so. (A682–683; A734; A736.) Zurlo testified that no forensic extraction of Snyder's phone was done, and that he took no steps to independently preserve Snyder's communications; instead, he instructed Snyder to "screenshot [the messages] and send them to me." (A633–636; A650–651.) Zurlo was unaware during the investigation that Snyder was also communicating with Taylor; he believed the second number with which Snyder was communicating also belonged to Brennan. (A638–640.)

**B. The Controlled Transactions**

Snyder conducted four controlled purchases between July 25, 2022 and September 2, 2022, each recorded on a body camera provided by law enforcement. (A565–566.) Snyder was paid $600 and provided government funds to conduct the buys. (A565–566.) Samantha Whitfield, a forensic scientist with the New York State Police Crime Laboratory, testified that laboratory testing established the purchased substances contained methamphetamine. (A906–910.)

1. **July 25, 2022 (Count 2)**

On July 25, 2022, Snyder conducted a controlled purchase of methamphetamine from Brennan outside of Brennan's home at 153 Knapp Road in the Town of Malta. (A569–571; A685–689.) Lab testing determined that the substance purchased contained approximately 3.669 grams of methamphetamine. (A915.)

Brennan testified that the July 25 sale was arranged through Samantha. According to Brennan, Jordan had requested methamphetamine for his own use, and—after Brennan initially refused—communicated through Samantha that if they did not supply him, he would no longer provide them with access to methamphetamine. Brennan testified that he ultimately agreed to the sale in order to preserve that connection. (A1043–1044.)

2. **July 29, 2022**

On July 29, 2022, Snyder arranged another purchase. The day before, Snyder texted Zurlo that Brennan "did not have any methamphetamine." (A636–637.) Snyder later conceded on cross-examination that he purchased methamphetamine from Samantha Taylor because Brennan did not have any to sell. (A745.) Zurlo similarly testified that Taylor exited the residence at 153 Knapp Road and sold methamphetamine to Snyder. (A575–577.) Lab testing showed approximately 3.478 grams of methamphetamine. (A917–918.)

Snyder testified that screenshots of text messages between him and Samantha Taylor on this date were a fair and accurate representation of his communications with Taylor. (A691–694.)

Investigator Zurlo testified that he received text message screenshots from Snyder on July 29, and that the screenshots that Snyder forwarded to him came from two different numbers. (A638.) Zurlo testified that he later learned one set of messages came from Samantha Taylor's phone. (A639–640.) Unlike the messages with Taylor, the messages attributed to Brennan from that date did not mention drugs. (A640.) Brennan was not charged with a distribution count based on the July 29 transaction.

**3. August 2, 2022 (Counts 3 and 4)**

Investigator Zurlo testified that on July 31, 2022, Snyder informed him via text message that he believed he could purchase a RAK-47 rifle for $2,500 from Brennan. (A642–643.) Snyder testified that it was his idea to ask Brennan if he could purchase a firearm, and that Brennan "had some hanging on the wall." (A638.) Trooper Casey provided the money for the gun purchase. (A925.) Investigator Zurlo testified that he asked Snyder if he could combine the gun purchase with a drug purchase. (A644–646.) The initial exchange occurred on August 2, 2022, in a Stewart's parking lot. (A578.) Snyder received the rifle but

did not receive methamphetamine, or other components of the firearm that time. (A579–580; A697.)

Later that day, Snyder retrieved a box from the mailbox at 153 Knapp Road containing methamphetamine, marijuana, a magazine, and ammunition. (A580–581.) Lab testing identified approximately 0.644 grams of methamphetamine. (A918–919.) No officer testified to observing who placed the box in the mailbox, and no surveillance captured the placement. (A948–949.) Nor were the communications arranging the mailbox retrieval fully preserved.

**4. September 7, 2022 (Count 5)**

On September 7, 2022, Snyder conducted another controlled purchase of methamphetamine from Brennan at 153 Knapp Road. (A582–583; A710–716.) Lab tests determined that the drugs purchased by Snyder on that date contained approximately 3.671 grams of methamphetamine. (A919.)

**C. The September 13, 2022, Search**

On September 13, 2022, law enforcement executed a search warrant at Brennan's residence. (A588.)

Officer Robin Jasmin testified that she recovered a Beretta handgun with a defaced serial number and magazine in a box beneath Brennan's bed (A774–775; A785), as well as long guns, and a box of magazines, and a number of electronic devices. (A776–777.) Special Agent Viup testified about taking possession of

eight firearms following the search, including a Beretta Model 96D .40 caliber pistol with a defaced serial number, multiple rifles and shotguns, and ammunition for all eight firearms. (A876–881.) On cross-examination, Agent Viup testified that four of the firearms were traced to a third party, Marc Nelson, a neighbor of Mr. Brennan's, and that she was able to read the serial number on the Beretta. (A883–886.)

In a room across the hall from Brennan's bedroom, Officer Jasmin recovered a scale with drug residue and a metal box containing drugs. (A778–780.) A DEA chemist testified that the net weight was 9.683 grams and that the substance was approximately 93 percent pure methamphetamine. (A897–900.) A digital scale and packaging materials were also recovered. (A778–779.)

Officer Jasmin also recovered approximately $1,000 from a leather bag in a dresser drawer in the second floor hallway. (A780–782.) Officer Jasmin testified that some prerecorded buy money from August 2 matched serial numbers of cash recovered during the search. (A787–789.)

Trooper Casey was also involved with the search. (A934.)

The jury acquitted Brennan of possession of firearms in furtherance of a drug trafficking crime based on the firearms found in the residence (Count 8). (A1267.)

### D. Mr. Brennan's Post-Arrest Statement

Special Agent Leahey, who transported Mr. Brennan from the Saratoga County Sheriff's Office to the federal courthouse in Albany after his arrest, testified that Mr. Brennan made multiple statements during this transport, including that he had served as the intermediary between two individuals in the sale of an AK-style firearm for $2,600 four weeks earlier, and that images and conversations about that purchase could be found on a phone that had been seized during the search. (A981–982.)

Trooper Casey participated in a post-arrest interview of Mr. Brennan, which was recorded. Clips of this interview were introduced through Casey's testimony (A935–945.)

### E. Evidence Extracted from Electronic Devices

The government introduced forensic extractions from devices seized during the search, including photographs of a crystalline substance and firearms and message exchanges that the government characterized as drug-related communications. (A795–825.) Agent Viup testified about message threads involving "Jor Dash" that included requests for "freeze", discussions of one or two "balls," pricing, and logistics for meeting, and message threads with someone named "Geoffy Jeff" about "die weed" and "half Tina" and requests for credit. (A852–860.) The government also introduced communications between Brennan

and Taylor in which he tells her he is out of drugs and that his "meth empire" is collapsing. (A867–870.)

### F. The Defense Case

Mr. Brennan testified in his own defense and offered an account of the events underlying the charged transactions.

He stated that he lived at 153 Knapp Road in Mechanicville with his mother and that, during July through September 2022, his girlfriend Samantha Taylor stayed there at times. (A1015–1016.) He described himself as self-employed, performing design, fabrication, and customization work involving cars, sneakers, leather goods, and cosmetic firearm modifications such as coatings and grips, and testified that he did not alter firearms' functional capabilities. (A1016–1017.)

Using photographs taken during the September 13, 2022, search, Brennan described the second-floor rooms and garage he used as workspaces and the tools and equipment used for shoe repair, sewing, and automotive restoration. (A1019–1028.) He testified that several firearms recovered from the residence were in his possession because he was customizing them for others. (A1028–A1033.)

Brennan testified that he used methamphetamine during the summer of 2022 and became a daily user, consuming approximately one to one-and-a-half grams per day, and that Taylor also used methamphetamine daily. (A1037–1038.) He stated that the methamphetamine found in the home was for his and Taylor's

personal use and that they obtained it from various sources while attempting to maintain a steady supply. (A1038.) He also testified that he used marijuana daily and sold marijuana occasionally in small quantities. (A1039–1040.)

Brennan testified that he met Jordan Snyder through Taylor in late June 2022, interacted with him frequently, sometimes paid him in cash or marijuana, and paid him to drive Taylor. (A1040–1042.) He testified that he sold Snyder methamphetamine on approximately July 25, 2022 (Count 2), as described above, and that the transaction was arranged through Taylor. (A1042–1043.) Brennan testified that he did not agree to sell methamphetamine to Snyder on July 29, 2022, and that he sold methamphetamine again on September 7, 2022 (Count 5), again conditioned on assurances that Snyder could help obtain more supply, and that Snyder helped him obtain half an ounce on September 9 or 10. (A1043–1046.) Brennan testified that the methamphetamine recovered during the September 13 search was the same methamphetamine obtained with Snyder's assistance and that there was no other methamphetamine in the house. (A1046.)

With respect to August 2, 2022 (Counts 3 and 4), Brennan testified that he sold Snyder a RAK-47 rifle for $2,500, but that the rifle belonged to another person and was in Brennan's possession only because he had customized it. (A1046–1047.) He testified that he did not agree to sell drugs in connection with the firearm sale and that he later learned Taylor had given Snyder

methamphetamine. (A1047–1049.) Brennan further testified that Snyder repeatedly sought to buy other firearms in Brennan's possession, but Brennan declined because they were not his to sell. (A1050–1051.) He also testified that he gave $1,500 of the rifle sale proceeds to the firearm's owner. (A1051–1052.)

Brennan testified that following the September 13 search he was interviewed by law enforcement for approximately two hours and was not completely truthful. (A1052.) He acknowledged that his earlier statement that he had sold methamphetamine "about 20 times" was inaccurate and testified that he had sold methamphetamine three to four times. (A1052–1053.) He described references in text messages to a "meth empire" as tongue-in-cheek banter with Taylor. (A1053–1054.)

Brennan also testified about a Beretta handgun kept in a locked box at the foot of his bed, describing it as a firearm he retained after a car purchase and used for grip mock-ups and attempted refinishing. (A1054–1056.) He identified in photographs a water pipe, a digital scale he testified he used to weigh marijuana and verify purchases, and a tin in which he stored methamphetamine for himself and Taylor. (A1059–1061.)

On cross-examination, Brennan reaffirmed that he sold methamphetamine to Snyder on July 25 and September 7, 2022, and that those were the only times he sold methamphetamine. (A1063–1064; A1065.) He acknowledged that the serial

number on the Beretta recovered from his bedroom had been removed, though he maintained that it occurred accidentally during attempted refinishing. (A1064.)

The government confronted Brennan with a sworn affidavit stating that the electronic devices seized during the September 13 search were his. Brennan testified that some devices had been used by Taylor but remained in his possession, and he acknowledged that photographs of himself and what he identified as crystal methamphetamine were found on those devices. (A1066–1069.) The government also introduced text messages between Brennan and Taylor referencing his "meth empire" and Taylor offering to "find buyers," and played portions of Brennan's post-search interview with law enforcement. (A1069–1070.) Brennan admitted that certain statements he made to law enforcement and to Pretrial Services regarding his methamphetamine history were untrue, while maintaining that he was a heavy daily user at the time of the search. (A1071–1072.)

The government further cross-examined Brennan regarding communications with a contact saved as "Jeffy Jeff," which the government characterized as drug-related, and questioned him about recorded statements describing a confrontation at his home shortly before the search during which he brought a shotgun to the door. (A1081–1085.) Brennan disputed the government's characterization of the incident and denied that it was connected to drug trafficking. (*Id.*)

On redirect, Brennan testified that he was not charged with any crime arising from the confrontation, clarified that references to "Jeffy Jeff" concerned marijuana quantities, and reiterated that his prior statement to law enforcement about possessing an ounce of methamphetamine for five years was inaccurate, explaining that he made misrepresentations because he was scared and did not want to disclose his sources. (A1092–1094.)

In rebuttal, Special Agent Lauren Viup testified regarding a recorded post-search interview of Brennan and read portions of text messages dated September 12, 2022, extracted from a seized cellphone and attributed to Brennan as the device operator. (A1098–1103.) The government offered this evidence to rebut Brennan's testimony minimizing the nature of the confrontation and denying that he pointed a firearm. The defense did not cross-examine Agent Viup.

### G. Rule 29 Motions, Partial Acquittal, and the Remaining Counts

After the close of the government's case, defense counsel moved under Federal Rule of Criminal Procedure 29 to dismiss Counts One, Four, and Eight of the Second Superseding Indictment. (A999.)

As to Count One (drug conspiracy), defense counsel argued that the government had introduced no evidence of an agreement between Mr. Brennan and any other person to distribute methamphetamine. (A999–1000.)

With respect to Count Four (use of a firearm in furtherance of a drug trafficking crime), defense counsel argued that the evidence showed the sale of an AK-47 unaccompanied by drugs, and that later-recovered methamphetamine, marijuana, ammunition, and a magazine could not be tied to the defendant. Counsel emphasized testimony indicating that law enforcement did not know who placed those items in the mailbox at 153 Knapp Road and that there was no evidence establishing that the firearm was used to further a drug trafficking offense. (A1000.)

Defense counsel made a similar argument as to Count Eight (possession of firearms in furtherance of a drug trafficking crime), contending that the firearms recovered from the residence were merely present in the home and that the government failed to establish any nexus between those firearms and drug trafficking activity. (A1000–1001.)

The government opposed the motion, arguing that the evidence was sufficient to sustain convictions on all three counts. The government relied on text messages, controlled-purchase testimony, and physical evidence recovered from the residence to support the conspiracy charge, asserted that the August 2, 2022 transaction demonstrated a firearm-drug nexus, and argued that the quantity of drugs, paraphernalia, firearms, and communications referencing firearm use were sufficient to establish possession of firearms in furtherance of drug trafficking. (A1001–1005.)

The district court reserved decision on the Rule 29 motion. (A1005.)

At the close of the evidence, defense counsel made a motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure for judgments of acquittal on Counts 1, 2, 3, 4, 5, and 8. (A1104.) Counsel argued, inter alia, that the defense had proven entrapment, shifting the burden to the government to establish predisposition, which the government had failed to prove. (A1104–1106.) Counsel renewed his arguments, made at the close of the government's case, that the evidence was insufficient to establish a conspiracy agreement, and that the firearm counts were unsupported by the evidence. (A1106–1108.)

The district court denied the Rule 29 motions on the record. (A1112–1113.)

### H. Defense Request for a Spoliation Instruction

Defense counsel further requested that the Court give a spoliation instruction and permit the jury to draw an adverse inference from the deletion and non-preservation of the text messages on Jordan Snyder's mobile phone. (A1123–1124.)

Defense counsel argued that Snyder admitted deleting messages; that law enforcement knew messages were being deleted; that no forensic extraction or preservation was performed; and that the missing communications were central to the government's conspiracy theory. (*Id.*)

The government opposed the request, acknowledging that Mr. Snyder was instructed to preserve all text messages and send them to Investigator Zurlo, but arguing that the evidence failed to establish that Snyder destroyed the messages knowing that they were important for prosecution, arguing that "it wasn't established that the informant knew the purpose of why he needed to give it to Investigator Zurlo or why those particular records were important." (A1126–1127.)

The district court denied the request, concluding that the defense had not established a sufficient evidentiary foundation for a spoliation instruction. (A1127.)

## I. Relevant Portions of the Jury Instructions

Relevant portions of the district court's instructions to the jury are included herein.

### a. Conspiracy (Count One)

With respect to Count One, the court instructed that the government was required to prove beyond a reasonable doubt:

That two or more persons entered into the unlawful agreement charged in the indictment;

That the defendant knowingly and willfully became a member of the conspiracy; and

That the conspiracy involved the distribution of, or possession with intent to distribute, a controlled substance. (A1164–1165.)

**b. Entrapment**

The court instructed the jury on the defense of entrapment. The jury was told that a defendant may not be convicted of a crime if the government gave him the idea to commit the crime, persuaded him to commit it, and he was not ready and willing to commit it before the government agent spoke to him. (A1159.)

**c. Possession with Intent to Distribute (Count Six)**

As to Count Six, the court instructed that the government was required to prove beyond a reasonable doubt that:

The defendant possessed a controlled substance;

The defendant knew that he possessed a controlled substance; and

The defendant possessed the substance with the intent to distribute it. (A1189.)

The court further instructed that the jury could consider factors such as quantity, packaging, presence of paraphernalia, and other surrounding circumstances in determining intent. (A1176.)

**d. Possession of a Firearm with an Obliterated Serial Number (Count Seven)**

With respect to Count Seven, the court instructed that the government was required to prove beyond a reasonable doubt that:

The defendant knowingly possessed the firearm;

The serial number on the firearm had been removed, obliterated, or altered;

The defendant knew that the serial number had been removed, obliterated, or altered; and

The firearm had traveled in interstate commerce. (A1193–1194.)

### J. The Government's Conspiracy Argument

In its closing argument to the jury, in support of Count 1, the conspiracy count, the government argued that the evidence established that together with Samantha Taylor to distribute methamphetamine.

The government told the jury that the proof of this conspiracy was found in text messages recovered from Brennan's phone. In one exchange, Brennan referenced his "meth empire collapsing," and Taylor responded that she would "find him buyers." The government argued that this exchange demonstrated that Taylor's role was to bring customers to Brennan and that the two were working together in a drug distribution operation. (A1219–A1220.)

The government also pointed to additional messages in which Taylor appeared to ask Brennan whether he had received a supply of methamphetamine, which the government characterized as evidence that she was involved in monitoring or facilitating drug distribution. (A1219.)

The government further relied on the July 29, 2022 transaction, during which Taylor exited the residence and sold methamphetamine to Jordan Snyder. (A1219–1220.)

Finally, the government pointed to Brennan's testimony regarding an earlier July 25, 2022 transaction. Brennan testified that Taylor arranged that transaction with Snyder, while Brennan completed the sale. The government argued that this demonstrated that Brennan and Taylor were "working together" and "taking turns" distributing methamphetamine. (A1220.)

**K. The Defense's Entrapment Theory**

In closing, defense counsel argued that Brennan was induced by the government's cooperating informant, Jordan Snyder, to engage in the charged conduct. Counsel emphasized the central role of Snyder's communications with Brennan and argued that the case could not be reliably evaluated given the gaps in those communications. (A1234–1235.)

The defense further argued that Snyder initiated and drove the interactions. Counsel pointed to Brennan's testimony that Snyder repeatedly sought to obtain methamphetamine from him in the days leading up to July 25, and that Brennan initially refused. (A1233.) According to the defense, when Brennan declined, Snyder would instead approach Samantha Taylor, using her as an intermediary to continue pressing for a transaction. (*Id.*)

Counsel argued that Snyder also leveraged his role as a source of future methamphetamine supply, creating pressure on Brennan to comply in order to maintain access. (*Id.*) The defense characterized this pattern—repeated requests, circumvention through Taylor, and pressure tied to future supply—as inducement. (A1232–1233.)

The defense also highlighted the absence of preserved communications between Snyder and Brennan. Counsel noted that, although law enforcement instructed Snyder not to delete text messages, they took no independent steps to preserve those communications, and that relevant messages were missing. (A1234.) Counsel argued that the government instead relied on whatever messages Snyder chose to provide, without ensuring the completeness or reliability of the record. (A1234–1235.)

According to the defense, the missing communications were "critically important" to the jury's evaluation of the case, particularly with respect to the entrapment defense. (A1235.) Counsel urged the jury to consider whether it could rely on the government's evidence in light of these gaps and the absence of a complete record of the interactions between Snyder and Brennan. (A1234.)

The defense further emphasized that the case was not about whether Brennan had engaged in conduct that was "wrong" or "immoral," but whether the

government had proven the charged offenses under the law, including whether Brennan was predisposed to commit them absent Snyder's involvement. (A1235.)

### L. The Verdict

On September 23, 2024, the jury returned a unanimous verdict. (A1265.)

The jury found Mr. Brennan guilty of a methamphetamine conspiracy (Count 1) and that the amount of methamphetamine reasonably foreseeable to the defendant was five grams or more. (A1265.) The jury further found him guilty of the July 25, 2022 and September 7, 2022, distribution counts (Counts 2 and 5), possession with intent to distribute five grams or more of methamphetamine on September 13, 2022 (Count 6), and possession of a firearm with an obliterated serial number (Count 7). He was acquitted of the August 2, 2022, distribution count (Count 3), of use or carrying of a firearm in connection with the August 2, 2022 distribution count (Count 4), and of use or carrying a firearm in connection with a methamphetamine conspiracy (Count 8). (A1265–1267.)

### M. Probation's Draft and Final Presentence Reports

Probation filed its initial Presentence Investigation Report on December 5, 2024 (the "draft PSR"). In the draft PSR, Probation attributed to Brennan 17.642 grams of actual methamphetamine based on three controlled purchases: 3.669 grams (July 25, 2022), 4.29 grams (September 7, 2022), and 9.683 grams

(September 13, 2022). That quantity resulted in a base offense level of 24 under U.S.S.G. § 2D1.1. (Draft PSR ¶ 55.)

Probation also recommended enhancements for possession of a firearm, threats of violence, maintaining a premises for drug distribution, and obstruction of justice. It did not recommend safety-valve relief or a reduction for acceptance of responsibility. Based on those calculations, Probation determined that Brennan's total offense level was 30. (Draft PSR ¶¶ 56–67.)

Based upon a total offense level of 30 and a criminal history category of I, Probation arrived at a guideline imprisonment range of 97 to 121 months. (Draft PSR ¶ 104.)

Pursuant to Federal Rules of Criminal Procedure Rule 32(f)(1), objections to the draft PSR were due two weeks after its filing, or by December 19, 2024. Both parties filed timely objections to the draft PSR on December 18, 2024, which were addressed in the final Presentence Investigation Report ("final PSR"). (Final PSR, pp. 36–46.)

In its objections to the draft PSR, the government objected to Probation's calculation of a base offense level of 24 based on a drug weight of less than 20 grams of actual amphetamines. The government argued that the 10.06 grams from controlled purchases, plus the 9.005 grams recovered from the September 13, 2022 search, equaled 19.06 grams of actual methamphetamine, and that only one gram

was needed to get over the 20-gram threshold, which could be established from Brennan's testimony that he acquired a "half ounce" on September 9th or 10th, together with photographs of quantities of methamphetamine extracted from a phone seized by the government and introduced as government exhibits. (Final PSR, pp. 36–38.)

Probation filed its final PSR on February 27, 2025. In that report, Probation recalculated the tested drug quantity as 19.823 grams of actual methamphetamine. (Final PSR ¶ 57.)

Probation agreed with the government that additional methamphetamine depicted in certain trial exhibits and photographs, together with trial testimony concerning those exhibits, increased the attributable quantity to more than 20 grams of actual methamphetamine. Based on that determination, Probation increased the base offense level from 24 to 26. (Final PSR ¶ 57.)

Probation otherwise maintained its recommended enhancements and denial of mitigating reductions, resulting in a total offense level of 34. (Final PSR ¶¶ 58-69.)

**N. The Parties' Sentencing Submissions**

On March 24, 2025, the parties filed simultaneous sentencing submissions addressing the PSR's advisory Guidelines calculation. The government adopted the Final PSR and requested a sentence near the middle of the advisory range of 151–

188 months. It argued that the PSR correctly applied enhancements for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1), credible threat of violence under § 2D1.1(b)(2) based on a September 5, 2022 dispute the government characterized as drug-related, maintaining a premises for drug distribution under § 2D1.1(b)(12), and obstruction of justice under § 3C1.1. The government also opposed safety-valve relief and the related two-level reduction under § 2D1.1(b)(18), arguing Brennan possessed a firearm in connection with the offense and failed to provide a complete and truthful proffer. (A1512–1531.)

The defense disputed those enhancements and challenged the PSR's drug-quantity calculation used to determine the base offense level. While the defense did not dispute Probation's calculation of 19.823 grams of methamphetamine "based on the jury's verdict," the defense argued the PSR improperly increased the drug quantity above 20 grams by estimating additional methamphetamine from photographs and double counting quantities already reflected in the charged conduct and seized drugs, and contended the proper base offense level corresponded to between 5 and 20 grams of actual methamphetamine. The defense further argued Brennan was eligible for safety-valve relief and proposed an advisory range of 41–51 months. It also sought a downward departure or variance based on a policy disagreement with U.S.S.G. § 2D1.1's treatment of high-purity ("actual") methamphetamine, arguing the Guidelines' purity-based differential is

not supported by empirical data and does not reliably reflect culpability. The defense noted that several courts outside the Second Circuit have questioned that approach and granted departures or variances on that basis. (A1353–1373.)

On March 28, 2025, the government filed a supplemental sentencing memorandum addressing the PSR's base offense level calculation. The government argued that Brennan had waived any objection to the base offense level by failing to object within the fourteen-day period following issuance of the Final PSR as required by Federal Rule of Criminal Procedure 32(f)(1). In any event, the government contended the PSR correctly calculated a base offense level of 26 because the offense involved between 20 and 35 grams of actual methamphetamine. As it had in its objections to the draft PSR, the government argued that the trial evidence established at least 19.823 grams from the controlled purchases and seizure, and additional quantity could be attributed based on Brennan's testimony that he obtained approximately one-half ounce of methamphetamine after the September 7, 2022 controlled purchase. Using the purity level established at trial, the government argued that the remaining quantity from that supply exceeded the threshold necessary to place the offense within the 20–35 gram range under U.S.S.G. § 2D1.1. (A1661–1663.)

On April 9, 2025, the defense filed a response to the government's supplemental sentencing memorandum disputing the government's waiver

argument. The defense contended that its objections were timely because it had submitted timely objections to the initial PSR on December 18, 2024, and after Probation increased its base offense level from 24 to 26 in the final PSR, the defense challenged the revised base offense level in its March 24, 2025 sentencing memorandum. The defense further argued that, even if the Court were to find the objection delayed, the government could not demonstrate prejudice because it had sufficient opportunity to respond. (A1664–1665.)

**O. The Sentencing**

At the April 10, 2025 sentencing, Judge Nardacci found the base offense level was 26, concluding that although the parties agreed Brennan was accountable for approximately 19.8 grams of actual methamphetamine from the controlled purchases, the Government proved by a preponderance that additional attributable quantity placed the offense between 20 and 35 grams of actual methamphetamine. The Court also stated that Brennan had waived a late challenge to the base offense level. (A1676–1677.)

The Court declined to treat most of the disputed offense-conduct paragraphs as guideline relevant conduct, except for limited context concerning Brennan's relationship with the confidential informant and photographs depicting currency or suspected narcotics. (A1675–1676.) The Court rejected the § 2D1.1(b)(1) dangerous-weapon enhancement and the § 2D1.1(b)(2) credible-threat

enhancement, finding the record did not establish the required connection to the offenses of conviction, but applied the § 2D1.1(b)(12) premises enhancement based on multiple methamphetamine distributions from Brennan's residence and the presence of drugs, proceeds, and paraphernalia there. (A1677–1681.)

The Court also applied the § 3C1.1 obstruction enhancement, finding Brennan willfully gave materially false testimony and inconsistent sworn statements concerning the number of methamphetamine sales or use and ownership of electronic devices. (A1681–1683.) The Court denied safety-valve relief, crediting the Government's position that Brennan's post-conviction proffer was not truthful. (A1683–1684.) With a total offense level of 30 and criminal history category I (A1684), the Court calculated an advisory range of 97 to 121 months and sentenced Brennan to 97 months' imprisonment on each count, concurrent, followed by four years of supervised release. (A1694.) The Court declined to depart or vary based on sentencing entrapment or manipulation and declined to vary based on the defense's policy argument regarding methamphetamine purity. (A1691–1692.)

## SUMMARY OF ARGUMENT

Brennan's conspiracy conviction cannot stand, the district court improperly denied a requested spoliation instruction, the sentence was procedurally unreasonable, and his conviction under 18 U.S.C. § 922(k) violates the Second Amendment as applied.

First, the evidence was insufficient to sustain Brennan's conviction for conspiracy to distribute methamphetamine. The government failed to prove the essential element of agreement. Its case rested on selected text-message excerpts, a single July 29 transaction conducted by Samantha Taylor, and Brennan's testimony that an earlier sale had been arranged through Taylor. That evidence may have suggested association or isolated assistance, but it did not establish beyond a reasonable doubt that Brennan and Taylor knowingly entered into a joint venture to distribute narcotics. Suspicion and association cannot substitute for proof of conspiracy.

Second, the district court erred in denying Brennan's request for a spoliation instruction. The government's cooperating informant admitted deleting text messages despite being instructed to preserve them, and law enforcement took no independent steps to secure those communications. The missing messages were central both to the government's conspiracy theory and to Brennan's entrapment defense, yet the jury saw only a selective subset of communications. Brennan was entitled to an instruction permitting the jury to draw an adverse inference from the government's failure to preserve relevant evidence.

Third, Brennan's sentence was procedurally unreasonable. The district court increased the base offense level from 24 to 26 by finding that the attributable methamphetamine quantity exceeded 20 grams, even though the specifically

quantified amount was approximately 19.8 grams. The court did not identify what additional quantity it found, what evidence supported that finding, or how it calculated the increase. Instead, it adopted the government's reasoning in general terms. Because the court failed to make findings sufficient to permit appellate review, the sentence must be vacated and remanded for resentencing.

Finally, Brennan's conviction under 18 U.S.C. § 922(k) cannot be sustained under the Second Amendment framework articulated in *District of Columbia v. Heller* and *New York State Rifle & Pistol Ass'n v. Bruen*. Brennan's conviction rested on possession in his home of an ordinary handgun. Section 922(k) criminalizes that possession solely because the firearm's serial number was altered or removed. The government cannot identify a historical tradition of prohibiting mere possession of common firearms in the home based on the condition of a modern identifying mark. As applied here, the statute is unconstitutional.

For these reasons, the Court should reverse Count One and direct entry of a judgment of acquittal; alternatively vacate Count One and remand for a new trial; vacate the sentence and remand for resentencing; and vacate the conviction under 18 U.S.C. § 922(k).

# ARGUMENT

## I. THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CONSPIRACY CONVICTION (COUNT 1)

### A. The Law

A defendant challenging the sufficiency of the evidence bears a "heavy burden."[2] *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (internal citations omitted). The Court must view the evidence in the light most favorable to the government and draw all permissible inferences in its favor. *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). But a conviction must be vacated where no rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

To prove conspiracy, the government must establish that two or more persons agreed to participate in a joint venture intended to commit an unlawful act. *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009). A defendant must in some sense "make [the venture] his own" and have a stake in its outcome. *Id.* (Internal citations omitted.)

The existence of a buyer-seller relationship, standing alone, does not establish conspiracy. Rather, there must be additional evidence of an agreement to

[2] Brennan preserved his sufficiency challenge through Rule 29 motions at the close of the government's case and at the close of evidence. (A999–1005; A1104–1108.)

pursue an objective beyond the sale transaction itself. *United States v. Hawkins*, 547 F.3d 66, 71–72 (2d Cir. 2008). Likewise, suspicious circumstances, mere association with wrongdoers, or presence at the scene do not establish intentional participation in a conspiracy. *United States v. Nusraty*, 867 F.2d 759, 763–64 (2d Cir. 1989); *United States v. Samaria*, 239 F.3d 228, 235 (2d Cir. 2001).

## B. The Government Failed to Prove an Agreement Between Brennan and Taylor

As outlined in its closing argument, the government's conspiracy theory rested on three categories of proof: (1) selected text-message excerpts between Brennan and Taylor; (2) Taylor's July 29, 2022 sale of methamphetamine to the informant outside Brennan's residence; and (3) Brennan's testimony that the earlier July 25, 2022 transaction was "arranged through Samantha." (A1042–1043.)

Even viewed collectively and in the light most favorable to the government, that evidence established, at most, association and isolated assistance in discrete transactions, not the knowing agreement necessary to sustain a conspiracy conviction.

### 1. The Text Messages Did Not Establish a Conspiratorial Agreement

The government relied on messages in which Brennan referenced his "meth empire collapsing," Taylor stated that she would "find buyers," and Taylor asked whether Brennan had received a supply. (A867–870; A1219–1220.)

Those selected exchanges did not establish a knowing agreement between Brennan and Taylor to jointly distribute methamphetamine. At most, they reflected familiarity, personal association, or sporadic assistance. They contained no evidence of shared profits, pooled inventory, coordinated pricing, division of responsibilities, future plans, or any mutual commitment to an ongoing narcotics venture.

Further, although the jury saw selected messages between Brennan and Taylor, it did not have the full set of communications among Brennan, Taylor, and the informant. Snyder admitted deleting messages with Brennan and Taylor because he "likes to keep a clean phone." (A682–683; A734; A736.) Investigator Zurlo acknowledged that law enforcement did not independently preserve Snyder's communications and never performed a forensic extraction of Snyder's phone. (A633–640; A650–651.) Because the informant deleted messages and law enforcement failed to preserve them independently, the jury was left to assess isolated excerpts without the surrounding context necessary to determine whether the communications reflected conspiracy, ordinary association, or transactions driven by the informant himself. In the absence of that context, isolated excerpts could not reliably establish a conspiratorial agreement beyond a reasonable doubt.

**2. Taylor's July 29 Sale Did Not Establish an Agreement**

The government also relied on evidence that Taylor exited the residence and sold methamphetamine to the informant on July 29, 2022.

Taylor was not observed acting together with Brennan during the July 29 transaction. Rather, the evidence showed only that Taylor exited the residence and sold methamphetamine to Snyder after Snyder informed Investigator Zurlo that Brennan "did not have any methamphetamine." (A575–577; A636–637; A745.)

That evidence showed only a single transaction involving Taylor acting independently. Brennan was not observed participating in the sale. Taylor was not charged and did not testify. At most, the evidence showed Taylor's participation in a discrete transaction at a location associated with Brennan. But mere association, presence, or participation in a single criminal act does not establish Brennan's knowing participation in a conspiracy with her.

A single sale by Taylor outside a shared residence does not establish that Brennan and Taylor had entered into an agreement to jointly distribute narcotics.

**3. Brennan's July 25 Testimony Did Not Establish an Agreement**

Finally, the government relied on Brennan's testimony that the July 25, 2022 transaction was "arranged through Samantha." (A1042–1043.)

Even granting the government all reasonable inferences, that testimony established no more than that Taylor facilitated communication concerning a single transaction. Brennan further testified that he and Taylor were daily methamphetamine users, that Snyder had become a source of supply, and that

Brennan agreed to the July 25 transaction only after Snyder indicated that failure to comply would jeopardize future access to methamphetamine. (A1037–1044.)

Whether or not the jury credited that explanation, the testimony did not establish that Brennan and Taylor had formed an agreement to distribute methamphetamine together. There was no evidence that Brennan and Taylor jointly controlled inventory, shared proceeds, coordinated future sales, or otherwise had a mutual stake in an ongoing venture.

#### 4. Collectively, the Evidence Remained Insufficient

Taken together, the government's proof established no more than a personal relationship, isolated assistance in transactions, and ambiguous communications. That may create suspicion, but "[s]uspicious circumstances ... are not enough to sustain a conviction for conspiracy." *Nusraty*, 867 F.2d at 763.

The government was entitled to reasonable inferences, but speculation cannot substitute for proof of agreement. Because the government failed to prove any joint objective beyond discrete transactions, or that Brennan made any broader venture "his own," *Parker*, 554 F.3d at 234, no rational juror could find beyond a reasonable doubt that Brennan and Taylor entered into a conspiratorial agreement.

### C. The Jury's Limited Verdict Further Illustrates the Narrowness of the Government's Proof

The jury acquitted Brennan of the August 2 distribution count (Count 3), the related § 924(c) count (Count 4), and the firearms-in-furtherance charge arising from the September 13 search (Count 8). (A1265–1267.)

To be sure, acquittals on some counts do not automatically invalidate convictions on others. *See, e.g., United States v. Powell*, 469 U.S. 57, 64–65 (1984). But the verdicts are relevant insofar as they demonstrate that the jury did not wholly accept the government's broader theory of an ongoing armed trafficking operation.

That matters here because the government's conspiracy theory invited the jury to infer a continuing narcotics enterprise from the same course of conduct. Yet the jury declined to convict on charges tied to significant components of that theory.

What remained after the jury rejected substantial portions of the government's broader trafficking theory was materially narrower proof: selected text-message excerpts, Taylor's isolated July 29 sale, and Brennan's acknowledgment that Taylor helped arrange an earlier transaction. That evidence was insufficient as a matter of law to establish the essential element of conspiratorial agreement.

Count One must therefore be vacated.

## II. THE DISTRICT COURT ERRED IN REFUSING TO GIVE A SPOLIATION INSTRUCTION REGARDING THE DELETION AND NON-PRESERVATION OF THE INFORMANT'S TEXT MESSAGES

### A. The Law

This Court reviews jury instructions *de novo*. *See United States v. McCarthy*, 271 F.3d 387, 396 (2d Cir.2001). Criminal defendants have the "right to a charge which reflects the defense theory." *United States v. Evangelista*, 122 F.3d 112, 116 (2d Cir.1997) (citation omitted). The Court will vacate a conviction if the instruction that was sought "accurately represented the law in every respect" and if "viewing as a whole the charge actually given, [the defendant] was prejudiced." *United States v. Dove*, 916 F.2d 41, 45 (2d Cir.1990) (internal citations omitted); *see also United States v. Pimentel*, 346 F.3d 285, 301–02 (2d Cir. 2003).

"[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002) (citation omitted). To establish the second element, the party requesting the instruction must show that the evidence is unavailable due to negligence or a higher degree of culpability,

such as intentional behavior. *See id*. at 108. To establish the third element, relevance, the party "must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.' " *Id*. at 109 (*quoting Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir.1998)).

Although spoliation issues arise more frequently in civil litigation, courts have recognized that the same principles apply in criminal cases, including where the government fails to preserve text communications central to its investigation. *See, e.g., United States v. Suarez*, 2010 WL 4226524, at *8–10 (D.N.J. Oct. 21, 2010) (approving adverse inference instruction where agents failed to preserve text messages with a cooperating witness).

**B. The Record Established a Sufficient Evidentiary Foundation**

The district court denied the requested instruction on the ground that the defense had not established a sufficient evidentiary foundation. (A1127.) That ruling misapplied the governing legal standard.

The record established each element necessary to support a spoliation instruction. The cooperating informant, Jordan Snyder, admitted that he deleted text messages with Brennan and Taylor because he "likes to keep a clean phone," despite being instructed by Investigator Zurlo to preserve those communications and provide screenshots to law enforcement. (A633–635; A682–683; A734;

A736.) Zurlo further acknowledged that law enforcement never independently preserved Snyder's communications, never performed a forensic extraction of Snyder's phone, and did not initially realize that Snyder was communicating separately with Taylor. (A633–640; A650–651.)

This evidence established both a duty to preserve the communications and, at minimum, grossly negligent conduct in failing to ensure their preservation. Law enforcement knew the communications were central to the investigation, specifically instructed Snyder not to delete them, and nevertheless failed to take basic independent preservation measures even after learning messages had been deleted. (A633–640; A682–683.)

The relevance of the missing communications was equally clear. The government's conspiracy theory depended heavily on communications among Snyder, Brennan, and Taylor. In closing argument, the government relied on selected text-message excerpts to argue that Brennan and Taylor were "working together" in a methamphetamine-distribution venture. (A1219–1220.) Those communications were likewise central to Brennan's entrapment defense, which depended on the nature of Snyder's interactions with Brennan and Taylor, including Brennan's testimony that Snyder repeatedly pressured him for drugs and leveraged future access to supply. (A1232–1235; A1042–1046.)

Yet the jury did not receive the complete universe of those communications. Instead, it saw only the subset of messages Snyder chose to preserve and provide to investigators. The missing communications may have provided context, contradiction, or evidence supporting Brennan's claim that Snyder initiated and drove the transactions. Without the complete record, the jury was left to evaluate alleged agreement and inducement through a selective and incomplete evidentiary lens.

Under these circumstances, the defense established far more than the minimal evidentiary foundation required to permit the jury to consider whether the government's failure to preserve critical communications undermined the reliability and completeness of its proof.

**C. The Error Was Prejudicial**

Mr. Brennan was prejudiced by the district court's error.

The conspiracy charge turned on whether Brennan entered into an agreement with Taylor and the informant. The government relied heavily on text-message evidence to establish that agreement. But the jury did not receive the complete record of those communications. Instead, it was presented with a subset of messages—those that the informant chose to preserve—while other communications were deleted and never recovered.

That asymmetry mattered. The missing messages may have provided context, contradiction, or exculpatory explanations bearing directly on intent and inducement, issues at the heart of Brennan's entrapment defense. Without access to the full set of communications, the jury was left to evaluate the government's theory based on an incomplete and potentially misleading record.

An adverse inference instruction would have given the jury a framework to account for that evidentiary gap. Without it, the jury had no guidance on how to evaluate the government's failure to preserve critical communications.

Where the government's proof of agreement rests on selective excerpts of communications, and the complete record has been lost through its own failure to preserve it, the refusal to permit an adverse inference instruction undermines confidence in the verdict.

There is at least a reasonable probability that the outcome would have been different had the jury been properly instructed. Brennan's conviction should therefore be vacated and the case remanded for a new trial.

## III. THE DISTRICT COURT PROCEDURALLY ERRED IN RAISING THE BASE OFFENSE LEVEL FROM 24 TO 26

### A. The Law

This Court reviews a sentence on appeal for procedural reasonableness, *United States v. Castillo*, 36 F.4th 431, 435 (2d Cir. 2022), employing a "deferential abuse-of-discretion standard." *United States v. Cavera*, 550 F.3d 180,

189 (2d Cir. 2008). “A sentence is procedurally unreasonable when the district court has committed a significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C. §] 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.” *United States v. Cooper*, 131 F.4th 127, 130 (2d Cir. 2025) (internal quotations omitted). The Court reviews questions of law regarding the district court's sentencing Guidelines calculations *de novo*. *United States v. Brown*, 945 F.3d 72, 75 (2d Cir. 2019). However, “[p]reserved errors in calculating the Guidelines are subject to harmless error review.” *Id.* (citing Fed. R. Crim. P. 52(a)).

As to disputed issues of fact, the district court must make findings with sufficient clarity to permit meaningful appellate review. *See, e.g., United States v. Ahders*, 622 F.3d 115, 121–122 (2d Cir.2010); *United States v. Ware*, 577 F.3d 442, 451–52 (2d Cir.2009); *United States v. Cavera*, 550 F.3d 180, 193 (2d Cir. 2008); *United States v. Carter*, 489 F.3d 528, 538 (2d Cir.2007).

That requirement applies with particular force to drug quantity determinations under U.S.S.G. § 2D1.1, where relatively small changes in attributable weight can alter the base offense level. The Second Circuit has repeatedly vacated and remanded where sentencing courts failed to make sufficiently specific findings regarding drug quantity or the evidentiary basis for

the quantity attributed to the defendant. *See United States v. Lanni*, 970 F.2d 1092, 1093 (2d Cir. 1992); *United States v. Maturo*, 982 F.2d 57, 62 (2d Cir. 1992); *United States v. Carter*, 489 F.3d at 538.

When the record does not reveal the factual basis for a drug quantity finding that affects the Guidelines range, remand is required because meaningful appellate review is not possible. *United States v. Jeffers*, 329 F.3d 94, 98–99 (2d Cir. 2003); *Lanni*, 970 F.2d at 1093; *Carter*, 489 F.3d at 538.

### B. The Court Increased the Base Offense Level Without Making Findings Sufficient to Support or Explain the Quantity Increase

The district court found that the parties agreed Brennan was accountable for approximately 19.8 grams of actual methamphetamine. (A1676–1677.) It nevertheless increased the base offense level from 24 to 26 by concluding that additional attributable quantity placed the offense between 20 and 35 grams of actual methamphetamine. (*Id.*)

That ruling was procedurally defective. Once the court accepted that the specifically quantified amount was approximately 19.823 grams, only a fractional additional amount was needed to cross the next threshold under U.S.S.G. § 2D1.1. (PSR ¶ 57; A1661–1663.) In that circumstance, precision mattered. The court was required to identify what additional quantity it attributed to Brennan, the evidence supporting that attribution, and the reasoning by which it concluded the total quantity fell between 20 and 35 grams.

The court did none of those things. It did not specify whether it relied on photographs, testimony regarding later-acquired methamphetamine, unseized narcotics, or some combination of sources. (A1661–1663.) It did not determine whether any depicted substance represented drugs already included in the 19.8-gram figure. It did not explain how any untested substance could reliably be quantified, nor whether any such amount could properly be treated as "actual" methamphetamine rather than mixture weight. And it did not state how much additional quantity it found attributable to Brennan.

Instead, the court stated only that, "[f]or the reasons articulated by the government," it found by a preponderance of the evidence that the total quantity was between 20 and 35 grams. (A1676–1677.) That generalized adoption of the government's position was not a substitute for specific judicial findings. Where a contested Guidelines threshold turns on disputed factual inferences, the sentencing court must make its own findings with enough specificity to permit appellate review.

The omission was consequential. This was not a case in which the evidence plainly placed the defendant far above the threshold. Rather, the court moved Brennan into a higher offense level based on an unspecified incremental quantity. Without articulated findings, neither Brennan nor this Court can determine whether the increase rested on reliable evidence or speculation.

### C. Brennan's Drug-Quantity Challenge Was Fully Litigated Before Sentencing

Under Rule 32(f)(1), parties generally must object to a Presentence Report within fourteen days of receiving it. Fed. R. Crim. P. 32(f)(1). A district court may, however, modify Rule 32 timing requirements for good cause. Fed. R. Crim. P. 32(b)(2).

Here, Brennan timely objected to the draft PSR on December 18, 2024. (A1664–1665.) At that time, the draft PSR calculated a base offense level of 24 based on 17.642 grams of actual methamphetamine. (Draft PSR ¶ 55.) The dispute arose only after the final PSR recalculated the tested quantity as approximately 19.823 grams and increased the base offense level from 24 to 26 based on additional estimated quantity derived from photographs and testimony concerning unseized methamphetamine. (Final PSR ¶ 57.)

After the final PSR was issued, Brennan repeatedly challenged the revised quantity calculation in sentencing submissions and at sentencing itself. (A1353–1373; A1664–1665.) The government responded on the merits in supplemental briefing. (A1661–1663.) The district court then expressly ruled on the dispute, concluding that the government had established by a preponderance of the evidence that the offense involved between 20 and 35 grams of actual methamphetamine. (A1676–1677.)

Although the district court also stated that Brennan had "waived" a late challenge to the base offense level, the revised drug-quantity issue was fully litigated before sentence was imposed and expressly resolved by the district court in determining the advisory Guidelines range. (A1661–1684.) Accordingly, the district court's factual findings and Guidelines calculation are properly subject to appellate review.

Moreover, although the district court addressed the revised quantity dispute on the merits, its explanation for adopting the government's theory remained insufficient to permit meaningful appellate review. The court did not identify what additional quantity it found attributable to Brennan, what evidence it credited in reaching that conclusion, or how it calculated an amount sufficient to exceed the 20-gram threshold. Instead, the court generally adopted the government's position. (A1676–1677.) Under these circumstances, remand for resentencing is required.

**D. The Error Was Not Harmless**

These errors were not harmless. The increase from base offense level 24 to 26 materially altered the advisory Guidelines calculation and ultimately contributed to a total offense level of 30 and advisory range of 97 to 121 months. (A1684.) The district court imposed a sentence at the bottom of that range. (A1694.) An erroneous Guidelines range exerts a powerful anchoring effect on the sentencing process.

Because the district court raised Brennan's offense level without adequate factual findings sufficient to permit meaningful appellate review, the sentence

should be vacated and the case remanded for resentencing under a correctly calculated Guidelines range.

## IV. BRENNAN'S CONVICTION UNDER 18 U.S.C. § 922(K) CANNOT BE SUSTAINED UNDER THE SECOND AMENDMENT FRAMEWORK SET FORTH IN *HELLER* AND *BRUEN*

### A. The Governing Framework

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II.

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment protects an individual right to possess a handgun in the home for the purpose of self-defense. 554 U.S. 570, 595, 635 (2008). The Court explained that the right to possess arms in the home lies at the Amendment's core. *Id*. at 628–35.

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court articulated a two-step framework to evaluate Second Amendment challenges. First, courts must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does not, the constitutional inquiry ends, and a plaintiff's challenge to the law fails. If the individual's conduct is covered, then "the Constitution presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In considering the second inquiry, courts must ascertain whether the new law is

"relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.* at 29 & n.7.

Section 922(k) provides, in relevant part, that it is unlawful to possess a firearm whose serial number has been removed, obliterated, or altered, provided the firearm has at some time moved in interstate commerce. 18 U.S.C. § 922(k).

As applied here, Brennan's conviction rested on possession of a handgun recovered from his residence. Because possession of a commonly used handgun in the home falls within the Second Amendment's core protection, § 922(k) is constitutional only if the government can establish an analogous historical tradition supporting such a prohibition.

### B. Section 922(k) Burdens Conduct Covered by the Second Amendment

Brennan was convicted under § 922(k) based on possession of a handgun found in his home. A handgun kept in the home for lawful purposes is the paradigmatic arm protected by *Heller*.

Section 922(k) criminalizes possession of an otherwise ordinary firearm solely because the manufacturer's identifying mark has been altered or removed. The statute thus burdens conduct covered by the Second Amendment's plain text.

The burden therefore shifts to the government to demonstrate that the prohibition is consistent with historical tradition.

### C. There Is No Historical Tradition of Criminalizing Mere Possession Based on an Altered Serial Number

Serial numbers are a modern development. At our nation's founding, there were no laws criminalizing mere possession of an otherwise functional firearm because it lacked or bore an altered identifying mark. Although governments historically regulated commercial firearms manufacture and sale, the government identifies no founding-era tradition of criminalizing mere possession of a commonly owned firearm in the home because it lacked a particular identifying mark.

Historical regulations concerning powder storage, militia inspection, commercial sales, or disarmament of dangerous persons are not analogous. Those laws addressed materially different concerns and did not impose a categorical ban on simple possession of an ordinary firearm in the home based on a nonfunctional marking.

Nor does § 922(k) turn on dangerousness, misuse, or prohibited status. It applies regardless of whether the possessor is dangerous, whether the firearm was lawfully acquired, or whether it was ever used unlawfully.

### D. This Case Presents a Narrow As-Applied Challenge

Brennan does not challenge laws regulating trafficking, unlawful transfers, fraudulent serialization, or possession of especially dangerous weapons. He raises the narrower claim that criminalizing simple possession of an otherwise ordinary handgun in the home, based solely on the condition of its serial number, exceeds the historical limits recognized in *Heller* and *Bruen*.

## CONCLUSION

For the foregoing reasons, Brennan's conviction on Count One should be reversed and a judgment of acquittal entered because the evidence was insufficient to establish a conspiratorial agreement.

In the alternative, Brennan's conviction should be vacated and the case remanded for a new trial because the district court improperly refused to give the requested spoliation instruction regarding the deletion and non-preservation of critical communications evidence.

Brennan's sentence should also be vacated and the case remanded for resentencing under a properly calculated Guidelines range.

Finally, Brennan's conviction under 18 U.S.C. § 922(k) should be vacated because, as applied here, the statute violates the Second Amendment.

Brennan respectfully requests such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York May 12, 2026



Sarah Kunstler, Esq.
*Attorney for Defendant-Appellant Brennan*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 10,825 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: May 12, 2026
Brooklyn, New York

Sarah Kunstler, Esq.
*Attorney for Defendant-Appellant Brennan*

# SPECIAL APPENDIX

**TABLE OF CONTENTS**


| | |
|---|---|
| Judgment Appealed From, dated April 21, 2025....... | SPA-1 |
| Memorandum Decision and Order of the Honorable Anne M. Nardacci, dated July 10, 2024................ | SPA-8 |

# UNITED STATES DISTRICT COURT

Northern District of New York

UNITED STATES OF AMERICA
v.
Charles Brennan

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 0206 1:24CR00012-001
USM Number: 21295-510

Scott W. Iseman
125 High Rock Avenue, Suite 215-H
Saratoga Springs, NY 12866
518-416-2158
Defendant's Attorney

**THE DEFENDANT:**

☐ pleaded guilty to count(s) of the on.
☐ pleaded nolo contendere to count(s) which was accepted by the court.
☒ was found guilty on counts 1, 2, 5, 6, and 7 of the Second Superseding Indictment on September 23, 2024 after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B) | Conspiracy to Possess with Intent to Distribute a Controlled Substance (5 Grams or More of Methamphetamine) | 09/13/2022 | 1 |
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | Distribution of a Controlled Substance (Methamphetamine) | 07/25/2022 | 2 |
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) | Distribution of a Controlled Substance (Methamphetamine) | 09/07/2022 | 5 |
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) | Possession with Intent to Distribute a Controlled Substance (Methamphetamine) | 09/13/2022 | 6 |
| 18 U.S.C. § 922(k) | Possession of a Firearm with an Obliterated Serial Number | 09/13/2022 | 7 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed in accordance with 18 U.S.C. § 3553 and the Sentencing Guidelines.

☒ The defendant has been found not guilty on counts 3, 4 and 8.
☐ Count(s) ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

April 10, 2025
Date of Imposition of Judgment

Anne M. Nardacci
U.S. District Judge

April 21, 2025
Date

DEFENDANT: Charles Brennan
CASE NUMBER: 0206 1:24CR00012-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

97 months, on each count, to run concurrently.

☒ The court makes the following recommendations to the Bureau of Prisons:

The defendant be housed in a facility as close to his residence in Mechanicville, New York as possible.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ☐ a.m. ☐ p.m. on.

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on.

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

**I have executed this judgment as follows:**

Defendant delivered on ________________________________________ to __________________________________________

at ________________________________________ with a certified copy of this judgment.

______________________________________________
UNITED STATES MARSHAL

______________________________________________
BY DEPUTY UNITED STATES MARSHAL

DEFENDANT: Charles Brennan
CASE NUMBER: 0206 1:24CR00012-001

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

4 years.
This consists of: 4 years on Counts 1 and 6; and 3 years on Counts 2, 5, and 7, to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state, or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. § § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(deselect if inapplicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that you pay in accordance with the Schedule of Payments sheet of this judgment.

You must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

DEFENDANT: Charles Brennan
CASE NUMBER: 0206 1:24CR00012-001

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4. You must answer truthfully the questions asked by your probation officer.

5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12. If the court determines in consultation with your probation officer that, based on your criminal record, personal history and characteristics, and the nature and circumstances of your offense, you pose a risk of committing further crimes against another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13. You must follow the instructions of the probation officer related to the conditions of supervision.

DEFENDANT: Charles Brennan
CASE NUMBER: 0206 1:24CR00012-001

## SPECIAL CONDITIONS OF SUPERVISION

1) You must participate in a program for substance abuse which will include testing for use of controlled substances, controlled substance analogues, and alcohol. This may include outpatient treatment as recommended by the treatment provider based upon your risk and needs. You may also be required to participate in inpatient treatment upon recommendation of the treatment provider and upon approval of the Court. The probation office must approve the location, frequency, and duration of outpatient treatment. You must abide by the rules of any treatment program which may include abstaining from the use of any alcohol.

2) You must not possess, use, or sell marijuana or any marijuana derivative (including any product containing cannabidiol (CBD) or THC) in any form (including but not limited to edibles) or for any purpose (including medical purposes).

3) You must participate in a mental health program which may include medical, psychological, or psychiatric evaluation and outpatient treatment as recommended by the treatment provider based upon your risk and needs. You may also be required to participate in inpatient treatment upon recommendation of the treatment provider and upon approval of the Court. The probation office must approve the location, frequency, and duration of outpatient treatment. You must abide by the rules of the program which may include a medication regime.

4) You must submit your person, and any property, house, residence, vehicle, papers, effects, computer, electronic communications devices, and any data storage devices or media, to search at any time, with or without a warrant, by any federal probation officer, or any other law enforcement officer from whom the Probation Office has requested assistance, with reasonable suspicion concerning a violation of a condition of probation or supervised release or unlawful conduct by you. Any items seized may be removed to the Probation Office or to the office of their designee for a more thorough examination.

5) You must contribute to the cost of any evaluation, testing, treatment and/or monitoring services rendered in an amount deemed reasonable according to the sliding scale co-payment schedule approved by the Court and utilized by the U.S. Probation Office. You must also cooperate with securing any available third party payments as directed.

## DEFENDANT'S ACKNOWLEDGMENT OF APPLICABLE CONDITIONS OF SUPERVISION

Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

The conditions of supervision have been read to me. I fully understand the conditions and have been provided a copy of them. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

____________________ ____________________
Defendant Date

____________________ ____________________
U.S. Probation Officer/Designated Witness Date

DEFENDANT: Charles Brennan
CASE NUMBER: 0206 1:24CR00012-001

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | AVAA Assessment** | Fine | Restitution |
|---|---|---|---|---|---|
| **TOTALS** | $500.00 | N/A | N/A | Waived | N/A |

☐ The determination of restitution is deferred until. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| **Totals** | | | |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
***Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Charles Brennan
CASE NUMBER: 0206 1:24CR00012-001

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☒ In full immediately; or

B ☐ Lump sum payment of $ due immediately; balance due

☐ not later than, or

☐ in accordance with ☐ D, ☐ E, ☐ F, or ☐ G below; or

C ☐ Payment to begin immediately (may be combined with ☐ D, ☐ E, or ☐ G below); or

D ☐ Payment in equal installments of $ over a period of, to commence after the date of this judgment; or

E ☐ Payment in equal installments of $ over a period of, to commence after release from imprisonment to a term of supervision; or

F ☐ Payment during the term of supervised release will commence within after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

G ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to **Clerk, U.S. District Court, Federal Bldg., 100 S. Clinton Street, P.O. Box 7367, Syracuse, N.Y. 13261-7367,** or to pay electronically, visit www.nynd.uscourts.gov for instructions, unless otherwise directed by the court, the probation officer, or the United States attorney. If a victim cannot be located, the restitution paid to the Clerk of the Court for that victim shall be sent to the Treasury, to be retrieved when the victim is located.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

☐ Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☒ The defendant shall forfeit the defendant's interest in the following property to the United States:

As outlined in the Preliminary Order of Forfeiture.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA Assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

1:24-cr-00012 (AMN)

CHARLES BRENNAN,

Defendant.

**APPEARANCES:** **OF COUNSEL:**

**HON. CARLA FREEDMAN**
United States Attorney for the
Northern District of New York
445 Broadway
Albany, New York 12207
*Counsel for the Government*

**ASHLYN JESSICA MIRANDA, ESQ.**
**ALLEN J. VICKEY, ESQ.**
**ELIZABETH A. CONGER, ESQ.**
Assistant United States Attorneys

**ISEMAN PLLC**
59 Franklin Street
Saratoga Springs, New York 12866
*Counsel for Defendant*

**SCOTT W. ISEMAN, ESQ.**

**Hon. Anne M. Nardacci, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Defendant Charles Brennan is charged by superseding indictment with seven counts: three counts of distribution of a controlled substance, a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); one count of possession with intent to distribute a controlled substance, a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); one count of use of a firearm during and in relation to and possession of a firearm in furtherance of a drug trafficking crime, a violation of 18 U.S.C. § 924(c)(1)(A) (Count Three); one count of possession of a firearm with an obliterated serial number, a violation of 18 U.S.C. § 922(k) (Count Six); and one count of possession of firearms in

furtherance of a drug trafficking crime, a violation of 18 U.S.C. § 924(c)(1)(A) (Count Seven). *See* Dkt. No. 56 (the "Indictment"). Presently before the Court is Defendant's omnibus pretrial motion pursuant to Rule 12 of the Federal Rules of Criminal Procedure to (i) dismiss the three firearm counts for failure to state an offense, and (ii) suppress any evidence obtained from electronic devices seized from Defendant's home. Dkt. Nos. 54-55, 64-65 (the "Motion").[1] The Government submitted responsive papers in opposition and Defendant submitted reply papers in further support. Dkt. Nos. 66-67.

For the reasons set forth below, Defendant's Motion is denied.

## II. BACKGROUND

The following facts are drawn from the Indictment, as amplified by certain additional materials, and are assumed to be true for purposes of ruling on the Motion. *See United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

In 2022, Defendant distributed methamphetamine to a confidential source on July 25, August 2, and September 7. Dkt. No. 56 at 1-2; Dkt. No. 66 at 38, ¶¶ 8-14.[2] On August 2, in addition to methamphetamine, Defendant also distributed a firearm to the confidential source. Dkt. No. 56 at 2; Dkt. No. 66 at 40, ¶¶ 11-13.

On September 13, 2022, state and federal investigators executed a search warrant at Defendant's Saratoga County residence. Dkt. No. 54-2 at 2, ¶ 1. During their search, investigators located, *inter alia*, eight firearms (one with an obliterated serial number), thousands of rounds of

[1] The Motion mistakenly refers to Count Five (possession with intent to distribute a controlled substance) instead of Count Six (possession of a firearm with an obliterated serial number) but only makes arguments concerning the latter. *See, e.g.,* Dkt. No. 54-3 at 11 ("Count Five infringes on the Defendant's Second Amendment right to possess the subject firearm and should be dismissed . . .").

[2] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

ammunition, drugs and drug paraphernalia, and 17 electronic devices. *Id.* at ¶ 2; Dkt. No. 66 at 81, ¶ 3. Later the same day, Defendant was charged in a one-count complaint with possession of a defaced firearm, a violation of 18 U.S.C. § 922(k). Dkt. No. 1.

On October 18, 2022, the Government applied for, and United States Magistrate Judge Daniel J. Stewart issued, a search warrant authorizing the search of the 17 electronic devices already in the Government's custody. Dkt. No. 66 at 30-79. The next day, a federal agent transferred 12 of the electronic devices to a United States Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") office in Syracuse, New York for pre-review processing. *Id.* at 83, ¶ 7. The agent began reviewing the remaining five devices herself. *Id.* On or about October 26, 2022, this agent and a colleague with specialized training identified an image depicting child pornography within one of the devices. *Id.* at 83, ¶ 10. Because child pornography was beyond the scope of the October 18 search warrant, the Government ceased all processing and review of the 17 electronic devices. *Id.* at 83, ¶¶ 10-11.

On October 31, 2022, the Government applied for, and Judge Stewart issued, a further search warrant authorizing the search of the 17 electronic devices in the Government's custody for violations relating to child pornography. *Id.* at 84, ¶ 12. On or about November 1, 2022, 10 of the 12 electronic devices at the ATF's Syracuse office were sent to a United States Homeland Security Investigations office in Buffalo, New York, for pre-review processing. *Id.* at 84, ¶ 13. Pre-review processing for all devices with recoverable electronically stored information ("ESI") finished by or about March 2024. Dkt. No. 54-1 at 7, ¶ 24; Dkt. No. 55 at 74-93; Dkt No. 66 at 83, ¶¶ 7-14.

In January 2024, a grand jury returned a six-count indictment against Defendant. Dkt. No. 35. In May 2024, a grand jury returned the seven-count superseding Indictment against Defendant. Dkt. No. 56. As relevant to the firearm counts challenged by Defendant's Motion, Count Three

of the Indictment, under Section 924(c)(1)(A), reads in pertinent part:

> On or about August 2, 2022, in Saratoga County in the Northern District of New York, the defendant, CHARLES BRENNAN, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, that is Distribution of a Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), knowingly used and carried a firearm, that is a 7.62 caliber Riley Defense RAK 47 rifle bearing serial number B27875, and in furtherance of such crime possessed such firearm, in violation of Title 18, United States Code, Section 924(c)(1)(A).

*Id.* at 2. Count Six, under Section 922(k), reads in pertinent part:

> On or about September 13, 2022, in Saratoga County in the Northern District of New York, the defendant, CHARLES BRENNAN, knowingly possessed a firearm that had been shipped and transported in interstate commerce, that is a .40 caliber Beretta semiautomatic pistol, model 96D, which had the manufacturer's serial number removed, obliterated, and altered, knowing that the serial number had been removed, obliterated, and altered, in violation of 18 U.S.C. § 922(k).

*Id.* at 3. And Count Seven, also under Section 924(c)(1)(A), reads in pertinent part:

> On or about September 13, 2022, in Saratoga County in the Northern District of New York, the defendant, CHARLES BRENNAN, in furtherance of a drug trafficking crime for which he may be prosecuted in a court of the United States, that is, Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1), knowingly possessed firearms, that is: [table detailing eight firearms] all in violation of Title 18, United States Code, Section 924(c)(1)(A).

*Id.* at 3-4.

## III. STANDARD OF REVIEW

Rule 12(b)(1) allows a party to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Such pre-trial motions include a motion asserting a "defect in the indictment" such as "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v); *accord United States v. Black*, No. 06-cr-1079, 2007 WL 683996, at *1 & n.4 (S.D.N.Y. Mar. 6, 2007). "The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Espinoza*, 442 F. Supp. 3d 596, 603 (S.D.N.Y. 2020)

(quoting *United States v. Bustos De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001)). In evaluating a motion to dismiss an indictment under Rule 12(b), courts generally "'accept[ ] as true all of the allegations of the indictment.'" *United States v. Greenberg*, No. 21-cr-92, 2022 WL 827304, at *1 (S.D.N.Y. Mar. 9, 2022) (quoting *Goldberg*, 756 F.2d at 950). A defendant may also move pursuant to Rule 12(b) for the suppression of evidence. Fed. R. Crim. P. 12(b)(3)(C); *see also* Fed. R. Crim. P. 41(h).

## IV. DISCUSSION

Defendant broadly argues that (i) 18 U.S.C. § 924(c)(1)(A) is unconstitutional, facially and as applied to him, in light of the Supreme Court's ruling in *New York Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022); (ii) 18 U.S.C. § 922(k) is unconstitutional, facially and as applied to him, in light of *Bruen*; and (iii) certain unidentified evidence collected from the 17 electronic devices should be suppressed. *See generally* Dkt. Nos. 54-3, 64, 67. The Court analyzes each argument in turn.

### A. Second Amendment Precedent

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court found that "the Second Amendment confer[s] an individual right to keep and bear arms," *id.* at 595, and held that "the District[ of Columbia]'s ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. The Court went on to state that, "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home." *Id.*

Thereafter, in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Supreme Court held that this individual Second Amendment right applies to state and local governments through the Fourteenth Amendment and invalidated a set of municipal laws that banned handguns in the home. *Id.* at 750, 767-68. Specifically, the Supreme Court identified its "central holding in *Heller*: that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home," and went on to "hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*." *Id.* at 780, 791.

Although both *Heller* and *McDonald* invalidated laws that banned handguns in the home, the Supreme Court made clear that the Second Amendment right is not unlimited and various regulatory measures remained constitutionally permissible. *See, e.g., Heller*, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited."); *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on [numerous] longstanding regulatory measures. . . . We repeat those assurances here.") (citing *Heller*, 554 U.S. at 626-27).

Following *Heller* and *McDonald*, the Second Circuit addressed whether Section 922(c) violates the Second Amendment. *United States v. Bryant*, 711 F.3d 364 (2d Cir. 2013) (*per curiam*). After carefully examining the limitations set forth in *Heller* and *McDonald*, a unanimous panel held "that the Second Amendment does not safeguard the *unlawful* purpose of possessing a firearm in furtherance of drug trafficking" and found 18 U.S.C. 924(c) constitutional as applied to a criminal defendant who possessed a firearm in his home in furtherance of drug trafficking. *Id.* at 365-66 (emphasis in original); *see also id.* at 369 ("'the central holding in *Heller*' was 'that the Second Amendment protects a personal right to keep and bear arms for *lawful* purposes, most

notably self-defense within the home.'") (quoting *McDonald*, 561 U.S. at 780) (emphasis in original). In reaching this conclusion, the Second Circuit reasoned that once the defendant engaged in drug trafficking "he was no longer a law-abiding citizen using the firearm for a lawful purpose, and his conviction for possession of a firearm under these circumstances does not burden his Second Amendment right to bear arms." *Id.* at 370.

Nearly a decade later, in *Bruen*, the Supreme Court considered the validity of New York's licensing regime for carrying a handgun in public under the Second Amendment. The Supreme Court held, "consistent with *Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. As a result, the Supreme Court found New York's licensing regime unconstitutional because the program required individuals to demonstrate "a special need for self-defense" before New York would provide a public-carry license. *Id.* at 11.

In *Bruen*, the Supreme Court also set forth the following framework to determine whether a government regulation of firearms violates the Second Amendment:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the [G]overnment may not simply posit that the regulation promotes an important interest.[[3]] Rather, the [G]overnment must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citation omitted). The Second Circuit subsequently noted that, "[l]ike the Fifth, Eighth, and Eleventh Circuits, we read *Bruen* as setting out a two-step framework, with the first step based

[3] The Supreme Court noted in *Bruen* that following *Heller* and *McDonald*, the Courts of Appeals had utilized a two-step "framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," but the high court "decline[d] to adopt that two-part approach." *Id.* at 17; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 297-98 (2d Cir. 2023).

on text and the second step based on history." *Antonyuk*, 89 F.4th at 298; *see also United States v. Rahimi*, No. 22-915, 2024 WL 3074728, at *32 (U.S. June 21, 2024) (Jackson, J., concurring).

Most recently, the Supreme Court applied *Bruen* in *Rahimi*, and found constitutional a federal statute that criminalized firearm possession. Specifically, the Supreme Court determined that:

> When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may—consistent with the Second Amendment—be banned from possessing firearms while the order is in effect. Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms. As applied to the facts of this case, [18 U.S.C. §] 922(g)(8) fits comfortably within this tradition.

*Rahimi*, 2024 WL 3074728, at *5. In the course of its decision, the Supreme Court also provided the following guidance related to the *Bruen* framework:

> [S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber. As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it "extends, prima facie, to all instruments that constitute bearable arms, even those that were not [yet] in existence." By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.
>
> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances."

*Id.* at *6 (alterations in original) (citations omitted).

**B. Constitutionality of 18 U.S.C. § 924(c)(1)(A)**

**1. Statutory language**

As for Count Three and Count Seven under 18 U.S.C. § 924(c)(1)(A), the statute reads in

pertinent part:

> [A]ny person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such . . . drug trafficking crime . . . be sentenced[, *inter alia*,] to a term of imprisonment of not less than 5 years.

**2. Defendant's facial challenge**

"To prevail on a facial challenge, the [challenger] must 'establish that no set of circumstances exists under which the [challenged] Act would be valid.' In other words, the plaintiff must show that the statute is unconstitutional in all of its applications." *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "For this reason, facial challenges are 'the most difficult to mount successfully.'" *Antonyuk*, 89 F.4th at 314 (alteration in original) (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015)). Finally, the Supreme Court has instructed that, in the context of facial challenges, "'[w]hen legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not to manufacturer conflict.'" *Rahimi*, 2024 WL 3074728, at *11 (alterations in original) (citations omitted).

Defendant argues that the Second Circuit's determination in *Bryant*, which upheld the constitutionality of Section 924(c)(1) under the Second Amendment, "is no longer good law following *Bruen*" and this Court must instead apply the two-step framework set forth in *Bruen*. Dkt. No. 54-3 at 11-12. Defendant then argues that Section 924(c)(1)(A) is unconstitutional under *Bruen* because (i) the Second Amendment's plain text purportedly covers Defendant's conduct; and (ii) there is no historical tradition of regulating the use or possession of firearms in connection with drug trafficking offenses. *Id.*; Dkt. No. 64 at 2. In opposition, the Government argues that *Bryant* continues to apply even after *Bruen*, and therefore *Bryant* forecloses Defendant's challenge

to the validity of Section 922(g)(1). Dkt. No. 66 at 13-15. The Government further argues that Section 924(c)(1)(A) is constitutional under both steps of *Bruen*. *Id.* at 15-16.

As an initial matter, the Court finds that *Bryant* remains good law following *Bruen*. Foremost, and despite Defendant's assertion to the contrary, the Court notes that *Bryant* did not rely upon the prior two-step framework abrogated by *Bruen*. *Bryant*, 711 F.3d at 368-70; *see also United States v. Mingues*, No. 23-cr-81, 2023 WL 9604697, at *5 & n.7 (N.D.N.Y. Dec. 23, 2023). The Second Circuit also did not identify *Bryant* among the precedent abrogated by *Bruen* during its recent and extensive examination of Second Amendment jurisprudence. *See Antonyuk*, 89 F.4th at 294-305.[4] In addition, while *Antonyuk* addressed different issues than those presented here, the decision nonetheless cited to *Bryant* for support. *Id.* at 313 n.20.

Further, numerous district courts within the Second Circuit have already examined *Bryant* post-*Bruen* and similarly confirmed that the precedent remains good law.[5] *See United States v. Golston*, No. 23-cr-362, 2024 WL 149603, at *5 (S.D.N.Y. Jan. 12, 2024) ("Far from undermining *Bryant*, *Bruen* reaffirmed that the Second Amendment protects 'the right of an ordinary, *law-abiding* citizen to possess a handgun in the home for self-defense.'") (emphasis in original) (quoting *Bruen*, 597 U.S. at 8-9); *United States v. Gonzalez*, No. 23-cv-18, 2024 WL 96517, at *6 (S.D.N.Y. Jan. 4, 2024) ("*Bruen* does nothing to undermine *Bryant*'s holding as to the

[4] The Supreme Court recently directed the Second Circuit to reconsider *Antonyuk* in light of *Rahimi*. *Antonyuk v. James*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024). This Court has not identified anything within *Rahimi* that would abrogate *Bryant*, nor the narrow propositions for which *Antonyuk* is cited herein. *See United States v. Herriott*, No. 23-cr-37, 2024 WL 3103275, at *2 n.1 (N.D. Ind. June 24, 2024) ("If anything, *Rahimi* can be seen as a softening of the approach to the Second Amendment taken in *Bruen*.").

[5] This Court has also recently examined, in detail, the continued viability of earlier Second Circuit precedent following *Bruen*. *See United States v. Brundige*, No. 23-cr-187, Dkt. No. 24, slip op. at 6-10 (N.D.N.Y. Jan. 4, 2024). While the criminal statute and Second Circuit precedent at issue in that decision are different than those here, *see United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013), this Court's reasoning as to the precedent's continued viability remains generally applicable.

constitutionality of Section 924(c) as applied to [defendant]'s conduct, a drug trafficking crime."); *Mingues*, 2023 WL 9604697, at *5 ("At bottom, given . . . *Bryant*'s reliance on reasoning from *Heller* and *McDonald* and *Bruen*'s unflagging reaffirmance of those decisions, it is clear that *Bruen* did not overrule . . . *Bryant*.").

Finally, and consistent with *Bryant*'s continued viability, multiple Courts of Appeals have also rejected constitutional challenges to Section 924(c) following *Bruen*. *See United States v. Lopez*, No. 22-13036, 2024 WL 2032792 (11th Cir. May 7, 2024); *United States v. Ruiz*, No. 23-10406, 2024 WL 1134725 (5th Cir. Mar. 15, 2024); *United States v. Cash*, No. 22-2713, 2023 WL 6532644 (3d Cir. Oct. 6, 2023); *United States v. Burgess*, Nos. 22-1110/22-1112, 2023 WL 179886 (6th Cir. Jan. 13, 2023); *In re Terry*, No. 22-13615-C, 2022 WL 20033240 (11th Cir. Nov. 14, 2022). In contrast, Defendant has not cited any persuasive authority holding otherwise, nor has the Court itself identified any such authority.

In sum, the Court finds that *Bryant* remains good law and that Section 924(c) is facially constitutional with respect to the Second Amendment.[6] Even if *Bryant* was no longer binding, the Court finds Section 924(c)(1) facially constitutional under *Bruen*'s two-step framework. This framework requires a court to first "interpret[ ] the plain text of the Amendment as historically understood" before then "determining whether the challenged law is consistent with this Nation's historical tradition of firearms regulation, as 'that delimits the outer bounds of the right to keep and bear arms.'" *Antonyuk,* 89 F.4th at 300 (quoting *Bruen*, 597 U.S. at 19).

[6] In addressing the as applied challenge raised in *Bryant*, the Second Circuit found that the defendant's possession of a firearm in connection with drug trafficking rendered Section 924(c)(1) constitutional "under these circumstances." *Bryant*, 711 F.3d at 370. Accordingly, because there are at least some circumstances under which Section 924(c)(1) is valid, Defendant's facial challenge necessarily fails. *Rahimi*, 2024 WL 3074728, at *11; *see also Mingues*, 2023 WL 9604697, at *3 n.4.

As to step one,[7] Defendant argues that "its obvious [sic] the statute proscribes an individual's Second Amendment right to possess a firearm." Dkt. No. 54-3 at 12. Such an argument dramatically oversimplifies the text of the Second Amendment, as explicated by the Supreme Court. In *Bruen*, the Court stated:

> Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to [the challenged statute]. It is undisputed that petitioners [ ]—two ordinary, law-abiding, adult citizens—are part of "the people" whom the Second Amendment protects. Nor does any party dispute that handguns are weapons "in common use" today for self-defense. We therefore turn to whether the plain text of the Second Amendment protects [petitioners'] proposed course of conduct—carrying handguns publicly for self-defense. We have little difficulty concluding that it does.

*Bruen*, 597 U.S. at 31-32 (citations omitted). Here, Defendant is (allegedly) not a law-abiding citizen, suggesting that he, unlike the "ordinary, law-abiding citizens" at issue in *Bruen*—as well as in *Heller*[8] and *McDonald*, *see Bruen*, 597 U.S. at 8-10—is not part of "the people" whom the Second Amendment protects.

Nonetheless assuming Defendant is, or remains, part of "the people" whom the Second Amendment protects,[9] the Court finds that at least one of the firearms he possessed is not a weapon

---

[7] The Court has not identified a discussion within the majority opinion in *Rahimi* that would provide further guidance as to the application of the first step of the *Bruen* framework. The Court has also not identified such guidance within the Second Circuit's prior extensive opinion in *Antonyuk*. 89 F.4th at 300 ("We focus here on the history-and-tradition prong."). Accordingly, the Court bases its analysis primarily on *Bruen*.

[8] *Heller*'s resolution "assum[ed] that Heller is not disqualified from the exercise of Second Amendment rights," seemingly in reference to his felony history and mental health status. *Heller*, 554 U.S. at 635, 631. In light of the current limited record, the Court does not address the effect of such statuses, if any, within its analysis of "the people."

[9] In one of the five concurrences in *Rahimi*, Justice Jackson identified a non-exhaustive list of "unresolved questions" following *Bruen*, including "[w]ho is protected by the Second Amendment, from a historical perspective?" 2024 WL 3074728, at *32-33 (Jackson, J., concurring); *see also Antonyuk*, 89 F.4th at 312-13 ("Though the Supreme Court has suggested that 'law-abiding,' 'responsible,' and/or 'ordinary' individuals are protected by the Second Amendment, it is far from clear whether these adjectives describe individuals who stand *outside*

"'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (citations omitted). As discussed in more detail below, *see* Section IV.C.2, *infra*, handguns with obliterated serial numbers are not "in common use." *See also United States v. Marzzarella*, 614 F.3d 85, 99 (3d Cir. 2010), *abrogated on other grounds by Bruen*, 597 U.S. 1 ("[W]e, like the District Court, cannot conceive of a lawful purpose for which a person would prefer an unmarked firearm . . ."). Further, the Court finds that the eight firearms at issue here—consisting of four rifles, three shotguns, and a handgun with an obliterated serial number—do not, in combination, constitute firearms "in common use" for self-defense. Dkt. No. 56 at 3-4; *see also Heller*, 554 U.S. at 595 ("[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*.") (emphasis in original).

Even if all eight firearms together were "in common use" today for self-defense, Defendant's alleged conduct is fatal to his Second Amendment claim. Defendant is alleged to have knowingly used and carried a firearm during and in relation to a drug trafficking crime in Count Three, and to have knowingly possessed firearms in furtherance of a drug trafficking crime in Count Seven. Such conduct is entirely distinguishable from "carrying handguns publicly for self-defense," the conduct at issue in *Bruen*, 597 U.S. at 32, or "possess[ing] a handgun in the home for the purpose of self-defense," the conduct at issue in *McDonald*, 561 U.S. at 791, and *Heller*, 554 U.S. at 628.

Indeed, as the Supreme Court has repeatedly made clear, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *see also McDonald*, 561 U.S. at 786;

---

the Second Amendment or instead those who may be disarmed *consistent with* that Amendment.") (emphasis in original) (citations omitted).

*Bruen*, 597 U.S. at 21; *Rahimi*, 2024 WL 3074728, at *5. Accordingly, the Court finds that the Second Amendment does not protect the illegal "course of conduct" in which Defendant allegedly engaged. *Bruen*, 597 U.S. at 32; *Golston*, 2024 WL 149603, at *5 ("Nothing in the Supreme Court's decision [in *Bruen*] suggests that the Second Amendment confers a right to possess a gun during the commission of a crime. Further, nothing in the Amendment's 'plain text' 'presumptively protects [such] conduct.'") (quoting *Bruen*, 597 U.S. at 24).

Moreover, the Court finds that the Government has satisfied its burden to establish that Section 924(c)(1)(a) is "relevantly similar," *Rahimi*, 2024 WL 3074728, at *6, to the Nation's "historical tradition of firearm regulation," *Bruen*, 597 U.S. at 34. *See* Dkt. No. 66 at 15-16. Indeed, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626 (citations omitted); *McDonald*, 561 U.S. at 786 (citing *Heller*, 554 U.S. at 626-27); *Bruen*, 597 U.S. at 21 (citing *Heller*, 554 U.S. at 626-27); *Rahimi*, 2024 WL 3074728, at *5 (citing *Heller*, 554 U.S. at 626-27); *see also Bruen*, 597 U.S. at 38 ("Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms."); *Rahimi*, 2024 WL 3074728, at *5 ("At the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers."). Accordingly, the Court also finds Section 924(c)(1)(A) facially constitutional under the second step of the *Bruen* framework.

**3. Defendant's as applied challenge**

"An as applied challenge 'requires an analysis of the facts of a particular case to determine

whether the application of a statute, even one constitutional on its face, deprived the [challenger] to whom it was applied of a protected right.'" *Goe v. Zucker*, 43 F.4th 19, 30 (2d Cir. 2022) (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006)).

Defendant's as applied challenge to the alleged firearm sale at issue in Count Three is that (i) the sale "was the product of law enforcement enticement through a solicitous confidential information [sic];" (ii) was not "accompanied by a contemporaneous drug transaction," and (iii) Defendant did not in any way use the firearm "directly as part of the sale." Dkt. No. 54-3 at 12-13. As to the firearms at issue in Count Seven, the Defendant argues that "there will be no evidence that the Defendant ever possessed any of the identified firearms as part of any of the controlled buys at issue in this case" and that four of the eight firearms were not his. Dkt. No. 64 at 2-4; Dkt. No. 67 at 3-4. The Government primarily argues in opposition that Defendant's alleged conduct under both counts is prohibited by Section 924(c) and not protected by the Second Amendment. Dkt. No. 66 at 16-19.

To the extent Defendant has raised facts particular to him, the Court finds both counts constitutional as applied to Defendant. As to Count Three, Defendant has not shown how the Government's use of a confidential informant here is somehow unique in a way that is constitutionally impermissible under the Second Amendment. Further, the Defendant allegedly sold both a firearm and drugs on August 2, 2022, following an earlier drug sale to the same buyer on July 25 and in advance of a subsequent drug sale to the same buyer on September 7. Dkt. No. 56 at 1-2; Dkt. No. 54-1 at 18, ¶¶ 8-14; *see, e.g., United States v. Bailey*, 882 F.3d 716, 717 (7th Cir. 2018) ("Because it was the opportunity to purchase a firearm that brought the informant to [defendant] and made possible the secondary sale of marijuana to the informant, the facts support the finding that [defendant]'s possession of the weapon furthered the marijuana sale.").

The Court also finds that Count Seven is constitutional as applied to Defendant. Defendant's argument that four of the firearms taken from his home purportedly belonged to other people is unpersuasive. Even if true, Defendant nonetheless retained possession of these four firearms for unidentified reasons and, at least as to one, for an extensive period of time. The summary of Defendant's Mirandized statements that he submits in support of the Motion indicate that a friend of his (who "died in Atlanta" approximately "three years ago") left the firearm with an obliterated serial number in Defendant's possession "approximately 10 years ago." Dkt. No. 54-2 at 3, ¶¶ 3, 7. The summary further indicates that Defendant "recently" fired this firearm on at least two separate occasions, one when "it malfunctioned"—following which he "took it apart, cleaned it and replaced the spring"—and then a second when he fired it "just to make sure the spring worked." *Id.* at ¶ 7. As to the three other firearms, Defendant contends in his Motion that they were left by a neighbor, at some point, but does not explain why he did not return the firearms, nor why the neighbor—who apparently "stopped speaking to the defendant because he believed the defendant was involved in [drug] dealing," Dkt. No. 64 at 3—did not retrieve them himself. Nonetheless, even assuming the Government cannot prove that Defendant possessed four of the eight firearms in Count Seven, Section 924(c) would still be constitutional as applied because of the four remaining firearms. *See Lopez*, 2024 WL 2032792, at *3 (finding that a defendant convicted under Section 924(c) of possessing a single firearm in furtherance of a drug trafficking crime "was not using the firearm as a law-abiding citizen, so we conclude that the statute is not unconstitutional as applied to him").

Defendant also acknowledges that he sold drugs, including from his home, and that he kept both firearms and drugs in his bedroom. Dkt. No. 54-2 at 3, ¶¶ 9, 11-14, 17; *see, e.g., United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (stating that for purposes of Section 924(c)(1)(A), "the

ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking") (quotation omitted); *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005) ("Possession of a firearm to defend a drug stash clearly furthers the crime of possession with intent to distribute the contents of that stash.").

In sum, Defendant's alleged illegal conduct here is not constitutionally protected and falls squarely within the reach of Section 924(c)(1)(A). *Bryant*, 711 F.3d at 365-66 ("[T]he Second Amendment does not safeguard the *unlawful* purpose of possessing a firearm in furtherance of drug trafficking."). Accordingly, the Motion's as applied challenge is denied. *Accord Gonzalez*, 2024 WL 96517, at *7 (denying as applied challenge to Section 924(c)(1)(A)); *Mingues*, 2023 WL 9604697, at *6-7 (denying as applied challenge to Section 924(c)(1)(A)).

**C. Constitutionality of 18 U.S.C. § 922(k)**

**1. Statutory language**

As for Count Six under 18 U.S.C. § 922(k), the statute reads as follows:

> It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

**2. Defendant's facial challenge**

Defendant asserts that Section 922(k) is no longer constitutional following *Bruen*. Dkt. No. 54-3 at 5-11. Under the *Bruen* framework, he argues that (i) Section 922(k) prohibits conduct protected by the plain text of the Second Amendment, and (ii) "there was not distinctly similar law [sic] in place at the time the Second Amendment was ratified." *Id.* at 6; *see also* Dkt. No. 67. In opposition, the Government argues that Section 922(k) is constitutional under both steps of *Bruen*. Dkt. No. 66 at 11-13, 15-16.

The Court agrees with the Government. For purposes of applying step one of *Bruen* to Count Six, the Court assumes Defendant to be part of "the people."[10] The Court finds, however, that a firearm with an obliterated serial number "'is not in common use' today for self-defense,'" and that possessing such an unlawful firearm is not protected by the Second Amendment. *Bruen*, 597 U.S. at 32. As the Supreme Court has made clear, the Second Amendment "extends only to certain types of weapons" and "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 623, 625 (citation omitted). Similarly, a "gun with an obliterated serial number is not a gun 'typically used by law-abiding people for law-abiding purposes,' but rather is useful for conducting criminal activity." *United States v. Dixson*, No. 21-cr-0054, 2023 WL 7102115, at *3 (E.D. Mo. Oct. 26, 2023) (citation omitted) (finding Section 922(k) constitutional under *Bruen* and denying motion to dismiss indictment); *United States v. Reyna*, No. 21-cr-41, 2022 WL 17714376, at *5 (N.D. Ind. Dec. 15, 2022) ("Law-abiding citizens don't typically possess firearms with obliterated serial numbers for lawful purposes.") (finding Section 922(k) constitutional under *Bruen* and denying motion to dismiss indictment); *see also United States v. Avila*, 672 F. Supp. 3d 1137, 1143 (D. Colo. 2023) ("Reason and the experience of law enforcement counsel that obliterating a firearm's serial number serves another purpose [instead of self-defense]: making the identity of a person who possesses a particular firearm more difficult to determine. This feature makes firearms with obliterated serial numbers useful for criminal activity . . .") (citation omitted) (finding Section 922(k) constitutional under *Bruen* and denying motion to dismiss indictment).

---

[10] *See* nn.7-9, *supra*. The Court also assumes, without deciding, that the facial constitutionality of the statute at issue in Count Six will be determined without reference to the other allegations in the Indictment. Because these other allegations are considered to be true for purposes of the Motion, considering them would suggest that Defendant is not an "ordinary, law-abiding" citizen and thus not part of "the people." *Goldberg*, 756 F.2d at 950; *Bruen*, 597 U.S. at 31-32.

The Court finds Section 922(k) constitutional under the first prong of *Bruen*, because the statute regulates conduct that does not implicate the plain text of the Second Amendment. Many other courts have reached the same conclusion. *See, e.g., United States v. Gomez*, No. 23-cr-107, Dkt. No. 56, slip op. at 13 (N.D.N.Y. Oct. 31, 2023) ("the conduct that § 922(k) regulates—possession of a gun without a serial number—is outside the scope of the Second Amendment."); *United States v. Alberts*, No. 23-cr-131, 2024 WL 1486145, at *4 (D. Mont. Apr. 5, 2024) ("[Section] 922(k) is constitutional at *Bruen* step 1 because the plain text of the Second Amendment does not protect the prohibited conduct—possessing a firearm with an obliterated serial number."); *United States v. Trujillo*, 670 F. Supp. 3d 1235, 1241 (D.N.M. 2023) ("[Section] 922(k) does not burden conduct protected by the Second Amendment's text."), *appeal dismissed*, No. 23-2080, 2023 WL 5093358 (10th Cir. Aug. 9, 2023); *United States v. Serrano*, 651 F. Supp. 3d 1192, 1210 (S.D. Cal. 2023) ("The Court finds that the Second Amendment's plain text does not cover the conduct regulated by § 922(k)."); *Dixson*, 2023 WL 7416327, at *4 ("[T]he plain text of the Second Amendment does not cover conduct regulated by § Section 922(k)."); *United States v. Bradley*, No. 22-cr-00098, 2023 WL 2621352, at *3 (S.D.W. Va. Mar 23, 2023) ("Because § 922(k) regulates a class of guns defined solely by a nonfunctional characteristic, the regulation is outside the scope or text of the Second Amendment.") (quotation omitted); *United States v. Holton*, 639 F. Supp. 3d 704, 710 (N.D. Tex. 2022) ("This Court does not believe that a law requiring serial numbers on firearms infringes on the right to keep and bear arms."); *Reyna*, 2022 WL 17714376, at *5 ("[Section] 922(k)'s regulated conduct is outside the scope of the Second Amendment . . ."); *United States v. Tita*, No. 21-cr-0334, 2022 WL 17850250, at *7 (D. Md. Dec. 22, 2022) ("This Court finds the conduct outlined in 18 U.S.C. § 922(k) is not

protected by the Second Amendment . . .").[11]

Even if there was a Second Amendment right to possess the unlawful firearms proscribed by Section 922(k), the Court finds that the Government has satisfied its burden to establish that Section 922(k) is "relevantly similar," *Rahimi*, 2024 WL 3074728, at *6, to the Nation's "historical tradition of firearm regulation," *Bruen*, 597 U.S. at 34. *See* Dkt. No. 66 at 15-16. As the Supreme Court has detailed: "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. *That accords with the historical understanding of the scope of the right. . . .*" *Heller*, 554 U.S. at 625 (emphasis added) (citation omitted); *see also id.* at 627 (stating that limitation of the Second Amendment "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'") (citing 4 W. Blackstone, Commentaries on the Laws of England 148-149 (1769); additional citations omitted); *Rahimi*, 2024 WL 3074728, at *5 (same), at *8-9 (describing the "'going armed' laws, a particular subset of the ancient common-law prohibition on affrays" as prohibiting, *inter alia*, "dangerous or unusual weapons") (citing 4 Blackstone 145, 149; additional citations omitted).

The Court also finds Section 922(k) facially constitutional under the second step of the *Bruen* framework, and again joins many other courts in doing so.[12] *See, e.g.*, *Gomez*, slip op. at 13 ("Even if the Second Amendment covered conduct that § 922(k) regulates, which it does not, the Government has presented sufficient evidence to demonstrate that § 922(k) is consistent with

---

[11] Given the Supreme Court's recent decision in *Rahimi*, the Court finds distinguishable the authority upon which Defendant relies regarding *Bruen*'s first prong. *Compare United States v. Price*, 635 F. Supp. 3d 455, 460 (S.D.W. Va. 2022)*, with Rahimi*, 2024 WL 3074728, at *11.

[12] The Court considers the discussion of *Bruen*'s second prong in *Price* unpersuasive in light of more recent guidance from the Supreme Court. *Compare Price*, 635 F. Supp. 3d at 460-64*, with Rahimi*, 2024 WL 3074728, at *6.

this Nation's historical tradition of firearm regulation."); *Trujillo*, 670 F. Supp. 3d at 1242 ("Even if § 922(k) did proscribe protected conduct, the United States has identified numerous historical analogues that demonstrate Section 922(k) is 'consistent with this Nation's historical tradition of firearm regulation.'") (quoting *Bruen*, 597 U.S. at 17); *Holton*, 639 F. Supp. 3d at 711 ("And even if § 922(k) did infringe on such rights, the Government has identified relevant historical analogues to meet its burden under *Bruen*."); *see also United States v. Trujillo*, No. 23-2080, 2023 WL 5093358, at *2 & n.1 (10th Cir. Aug. 9, 2023) ("The bottom line is that § Section 922(k) has not been deemed unconstitutional. . . . No circuit court has found § 922(k) unconstitutional since *Bruen*, and the majority of district courts that have addressed the issue have concluded that § 922(k) satisfies the *Bruen* test.").

**3. Defendant's as applied challenge**

Defendant's as applied challenge to Count Six is that Government can only prove that he possessed a firearm with an obliterated serial number, not that he obliterated the serial number, nor that he used the firearm in any way. Dkt. No. 54-3 at 11. The Government argues that Defendant's perfunctory challenge has no merit, as his allegedly knowing possession falls within the scope of Section 922(k) and is not constitutionally protected. Dkt. No. 66 at 16-17.

The Court agrees with the Government. Defendant's four sentences of argument[13] do not demonstrate how the particular facts of this case establish that he was deprived of "a protected right." *Goe*, 43 F.4th at 30 (citation omitted); *see also Mingues*, 2023 WL 9604697, at *6-7; *Golston*, 2024 WL 149603, at *4 n.5. As discussed previously, the Second Amendment right is not "unlimited" and has never been "a right to keep and carry any weapon whatsoever." *Heller*,

[13] To the extent Defendant's as applied arguments regarding Count Seven are also applicable to Count Six, they fail for the same reasons previously detailed. *See* Section IV.B.3, *supra*.

554 U.S. at 626; *see also McDonald*, 561 U.S. at 786; *Bruen*, 597 U.S. at 21; *Rahimi*, 2024 WL 3074728, at *5.

Accordingly, the Motion's as applied challenge to Section 922(k) is denied.

**D. Suppression**

In the final two paragraphs of the Motion, Defendant argues that any evidence obtained from the 17 electronic devices seized from his home should be suppressed.[14] Dkt. No. 54-3 at 13-14. Defendant does not argue that the seizure of the electronic devices was untimely or otherwise unconstitutional.[15] Rather, he argues that the Government did not "copy or extract" all 17 devices within the 14-day period(s) the Government had to execute the October 18 and 31 search warrants. As a result, he says, any resulting evidence should be suppressed pursuant to Rule 41 of the Federal Rules of Criminal Procedure. In opposition, the Government argues, *inter alia*, that because the search warrants were timely executed, Rule 41 permits the subsequent copying or extraction of the seized devices. Dkt. No. 66 at 20-22.

The Court agrees with the Government. Rule 41(e)(2)(B) expressly provides that "[t]he time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, *and not to any later off-site copying or review*." Fed. R. Crim. P. 41(e)(2)(B) (emphasis added). The corresponding advisory committee notes provide further clarity:

> Computers and other electronic storage media commonly contain such large amounts of information that it is often impractical for law enforcement to review all of the information during execution of the warrant at the search location. *This rule* [*Rule 41(e)(2)*] *acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later* to determine what

[14] Given Defendant's argument is regarding "at least 15 if not 16" of the devices, Dkt. No. 54-3 at 14, and "no less than 15" of the devices, Dkt. No. 54-1 at 7, ¶¶ 22-24, the Court addresses all 17 electronic devices for the avoidance of doubt.

[15] To the extent the Motion could be read to raise a Fourth Amendment argument, such an argument would fail. *See United States v. Johnson*, 93 F.4th 605, 616 (2d. Cir. 2024); *see also* Dkt. No. 66 at 22-27.

> electronically stored information falls within the scope of the warrant.
>
> . . . .
>
> In addition to addressing the two-step process inherent in searches for electronically stored information, *the Rule limits the 10* [*now 14*] . . . *day execution period to the actual execution of the warrant and the on-site activity.* While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. *A substantial amount of time can be involved in the forensic imaging and review of information.* This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs.

Fed. R. Crim. P. 41(e)(2) advisory committee note to 2009 amendment (emphasis added).

Defendant does not contest that the Government timely seized the 17 electronic devices pursuant to lawful search warrants. He cites no legal authority for his assertion that the Government was required to copy or extract all 17 electronic devices concurrently with the execution of those search warrants, and Rule 41(e)(2)(B) expressly provides otherwise. Moreover, Defendant fails to address the weight of authority contrary to his position. *See, e.g., United States v. Estime*, No. 19-cr-711, 2020 WL 6075554, at *13 (S.D.N.Y. Oct. 14, 2020) ("The majority of courts that have considered the issue agree that, consistent with the language of Fed. R. Crim. P. 41(e)(2)(B) and the advisory committee's notes, the Government does not need to copy the entire storage medium or review the ESI in order to execute a search warrant for ESI.") (collecting cases).

Because Defendant has not established that the Government violated Rule 41, his request to suppress evidence is denied.[16]

[16] Defendant requested an evidentiary hearing on his suppression claim. Dkt. No. 54 at 1. The Government in its opposition argues that because Defendant "failed to demonstrate a factual dispute associated with his suppression claim," his request for an evidentiary hearing on this issue should be denied. Dkt. No. 66 at 27. Defendant did not respond to this argument. *See generally* Dkt. No. 67. The Court finds that because there is no factual dispute, and Defendant's suppression claim fails as a matter of law, an evidentiary hearing is not warranted. *See United States v.*

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's Motion, Dkt. No. 54, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: July 10, 2024
Albany, New York

Anne M. Nardacci
U.S. District Judge

*LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (finding that "[w]ithout disputed facts, no hearing [i]s necessary"); *United States v. Sosa*, 379 F. Supp. 3d 217, at 223 (S.D.N.Y. 2019); *see also* N.D.N.Y. L.R. Crim. P. 12.1(e). Defendant also requested oral argument on his constitutional claims. Dkt. No. 54 at 1. For similar reasons, the Court declines to exercise its discretion to grant oral argument on these claims. N.D.N.Y. L.R. Crim. P. 12.1(a).